[Civ. No. 13806. First Dist., Div. Two. Mar. 29, 1949.]

JOHN L. PASTORINO, Appellant, v. GREENE BROTHERS (a Partnership) et al., Respondents.

W. C. Black, Jr., and A. F. Mack, Jr., for Appellant.

McCarthy & Rowell for Respondents.

GOODELL, J.—Appellant sued for $7,250 damages for the breach of a contract whereby he was employed as master of a fishing vessel owned by respondents. By cross-complaint respondents claimed $999.47 as expenses incurred in repossessing the vessel, plus $239.91 alleged damage to the vessel, and $2,000 exemplary damages. The court awarded respondents judgment for $520 on their cross-complaint and this appeal was taken.

Appellant has been a commercial fisherman on this coast since 1926 and a master of fishing vessels since 1942. Respondents are in the construction business in San Mateo county, but in 1945 they had a fishing vessel 62 feet in length and of 15-foot beam, built for themselves, at a cost of $45,000. She was named the "Green Dolphin." On July 30, 1945, respondents and appellant entered into a contract providing in paragraphs one and three that Pastorino would act as her captain for one year from July 31, 1945, to July 31, 1946. By para-

graph two Pastorino agreed "in his capacity of Captain . . . to operate and take care of the said vessel to the best of his ability at all times." By paragraph four Greene Brothers agreed to pay Pastorino "for acting as Captain" 5 per cent "of the Boat share," and by paragraph five the parties agreed that Pastorino should receive in addition thereto "a regular Crew Member's one (1) share, as per the common method of dividing the Fishing vessel's Shares." Those were its only provisions.

The vessel's first trip was to fish for tuna off the Oregon coast. Respondent Ralph Greene, who had just made a six-months' study of the fishing business, went along on this trip, which lasted from August 16 to November 1, 1945. The day after the vessel returned she sailed from San Francisco to fish for tuna out of San Pedro. While so engaged appellant made arrangements to haul clams from the coast of Lower California to a cannery at San Pedro which, according to appellant's judgment, was the only profitable activity for the boat as she was then equipped. Respondents were consulted by appellant about this expedition and did not object to it. This trip lasted for the first two weeks of December, and the vessel then returned to San Francisco for a copper painting job, also for a checkup by her builders. She remained from December 20, 1945, to January 5, 1946, during which time respondents attempted to find marine-ways on which she could be painted. The shipyards were crowded, a machinists' strike was on, and it appeared that there would be a further delay of two or three weeks. From the record it fairly appears that appellant became restive and impatient; of course he was earning nothing during this lay-up and was under expense. Moreover, it appears that while engaged on the clam hauling operation appellant had made a commitment to return on January 9, for another tour carrying clams from the coast of Lower California to San Pedro, and time was running short. Respondents had brought up the question of dragnet fishing out of San Francisco and had told appellant that they disapproved of any further hauling of clams. The vessel was equipped only for tuna fishing; new and different gear would be required for dragnet fishing and respondents had taken no steps toward procuring it beyond the making of inquiries. In this situation appellant on January 5 sailed from San Francisco for San Pedro to keep the engagement he had made for the hauling of clams. The first the owners knew of his

departure was a radio message which he sent after getting out to sea. Respondents immediately radioed him to return, which he refused to do, and they had the Coast Guard send out a cutter which ordered the "Green Dolphin" into Santa Barbara. Ralph Greene went there at once, ordered appellant to take the vessel back to San Francisco, which he refused to do, and Greene discharged him and took possession of the vessel.

Appellant's action in sailing from San Francisco on January 5 without consulting respondents and after they had disapproved any further clam operations indicates his position with respect to his power and authority as master; respondents' action in ordering him back indicates theirs.

It is appellant's contention that what he did was fully justified by the custom and usage surrounding contracts such as the one in question.

The court sustained objections to every question by which appellant attempted to prove custom and usage and he followed up these adverse rulings with offers of proof—four or five of them—all of which were rejected.

Appellant's contention on this appeal is fairly indicated by the following tender: "I would like to make an offer of proof that there is a common custom or usage amounting to uniform practice as followed in the commercial fishing business as to whether or not the owners or master or Captain shall have full control of the operation of the vessel under such circumstances as I enumerated in my preamble. This common custom or usage isn't a local custom, but pertains to the . . . entire coastal country. This custom or usage is followed by all of the people in the fishing business and it is of universal application to all those in the commercial fishing industry and isn't just used occasionally and there is absolutely no exception to it. It is well known in the fishing business. This common custom or usage . . . is that the master of the ship has complete control of his own ship for the term of the contract. He can take the vessel out and he can decide when and where the vessel should operate and the owners of the vessel have no authority to determine when and where the vessel is to be taken over the captain's decision under such circumstances."

Appellant also made the following tender which involved the question of damages by way of prospective profits. After he had described the *modus operandi* of the initial clam hauling venture he was asked whether, while on that trip he had made arrangements for a future trip. Respondents objected

on the ground that "The owners didn't authorize any future trips and on the contrary specifically refused to permit any future trips." Appellant's counsel argued that the question bore "on the question of damages as to what he could do and how much he could make." The court sustained the objection. Appellant then offered to prove that while appellant was on the first clam hauling operation he had arranged for another similar trip; "that he made arrangements for 400 of these Mexicans to be digging clams so he could leave on the trip January 9th from San Pedro, meet them down there with fresh water and pick up the clams . . . that this same canning company made an agreement with him, a verbal one, that they would guarantee him one trip a month for the next 7 months and that they would purchase the clams that he would bring up on each of these trips for the next succeeding 7 months, and . . . that in boats of this size and equipped as this boat was, they made more money and profit than any other boat in any other type of fishing equipped the same as this boat."

The trial court's view of the case is illustrated by one of the rulings rejecting evidence of custom, namely, "The contract is the basis of this whole affair, this whole action."

■ The court erred in sustaining the objections and in rejecting the proffered evidence of custom. The contract is, of course, "the basis of this whole affair" but it is absolutely silent respecting control, and upon that question this case must turn. If appellant had the right as master to take the vessel south on January 5 the respondents breached the contract; if not, then he did. In the absence of a written provision or oral testimony of an understanding (see *Buckner* v. *A. Leon & Co.*, 204 Cal. 225, 227 [267 P. 693]) the court had to be informed from some source as to what the contract meant and that source was evidence as to custom and usage.

In *Hind* v. *Oriental Products Co.*, 195 Cal. 655, 667 [235 P. 438], it is said: "It is the general rule that when there is a known usage of the trade, persons carrying on that trade are deemed to have contracted in reference to the usage unless the contrary appears; that the usage forms a part of the contract, and that evidence of usage is always admissible to supply a deficiency or as a means of interpretation where it does not alter or vary the terms of the contract [citations]." This was quoted in *Buckner* v. *A. Leon & Co., supra,* 204 Cal. 225, 227. And in the recent case of *Isenberg* v. *California etc.*

*Commission,* 30 Cal.2d 34, 37 [180 P.2d 11], the court again followed the Hind case, saying: "Clearly, the existence of a contractual right may be shown by usages and customs." This need not be elaborated nor further authorities cited since the rule is definitely settled not only by case law but by statute. Section 1637, Civil Code provides that "For the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful, the rules given in this chapter [Interpretation of Contracts] are to be applied." Sections 1646, 1655 and 1656, Civil Code, state such rules, while section 1870, Code of Civil Procedure, provides that evidence may be given of "Usage, to explain the true character of an act, contract, or instrument, where such true character is not otherwise plain, but usage is never admissible, except as an instrument of interpretation; . . ."

■ One of the objections to the proffered evidence was that "it doesn't appear that any such custom, if there ever was one, was known to the owners and agreed by them" and that point is now pressed by respondents, the argument being that they were in the building business and this fishing venture was new to them. *Miller* v. *Germain Seed & Plant Co.,* 193 Cal. 62, 69 [222 P. 817, 32 A.L.R. 1215] answers this contention. It is there said: "The rule seems to be uniform that a party to a contract may be bound by a custom not inconsistent with the terms of the contract, even though he is ignorant of the custom, if that custom is of such general and universal application that he may be conclusively presumed to know of the custom . . . The rule that a person will be presumed to have contracted with reference to a general custom or usage whether he knew of that custom or not has frequently been invoked."

Appellant's tender represented to the court that he proposed to prove that the custom was general and universal up and down the Pacific coast. He was precluded from doing so. Whether he could have convinced the court that such general and universal custom existed is not now before this court. Appellant could not prove his whole case by one question and answer but was entitled to take one step at a time. The rule of the Germain Seed case was applied in *Newcomb & Co. Ltd.* v. *Sainte Claire Realty Co.,* 55 Cal.App.2d 437, 440 [130 P.2d 793], where the same claim was made of ignorance of the custom. ■ Over and above what has been said, Ralph Greene's own testimony shows that it was he who drew the contract. Appellant's testimony shows that the contract was

the same as those "commonly used, whether oral or written, in the operation of fishing vessels." Ralph Greene had spent the six months just before the vessel was completed making a study of the fishing business, journeying up and down the coast to familiarize himself with its operations and practices. When the $45,000 vessel was commissioned respondents had definitely embarked in the commercial fishing business and could not claim to be strangers to its practices, hence *Latta* v. *Da Roza*, 100 Cal.App. 606 [280 P. 711, 281 P. 655] and *People* v. *Seymour*, 54 Cal.App.2d 266 [128 P.2d 726], relied on by respondents are not in point.

There is enough in this record to show that commercial fishing is decidedly unlike ordinary business enterprises. The evidence shows, for instance, that the captain and crew of this vessel got no stated compensation whatever from the owners but had to depend on a share of the proceeds of the catch—the result of their own skill, experience and industry. Judging by this record, an owner does not even supply the provisions for a fishing vessel; these are paid for by those who man it.

It would appear (but on this question we make no holding) that the contract of July 30, 1945, is what is known as a "fishing lay" of some type or other. Definitions of a "fishing lay" are found in 24 Words and Phrases (perm. ed.), page 444. See, also, 56 Corpus Juris, page 1058, title "Lay or share of earnings." The cases of *Cromwell* v. *Slaney*, 65 F.2d 940 cited by appellant and *The Carrier Dove*, 38 C.C.A. 73 [97 F. 111] cited therein give some idea of what "fishing lays" are and how they operate. Such authorities show at a glance the necessity for admitting evidence of custom and usage in a case of this kind. They are not cited by us as authority on any point herein, but simply because of the general discussions found therein of fishing contracts.

There was considerable testimony as to the claimed unseaworthiness of the vessel, and her condition when she was repossessed at Santa Barbara, but it is not necessary to review that part of the record in view of the prejudicial errors already discussed.

The judgment is reversed and the cause remanded for a new trial.

Nourse, P. J., and Dooling, J., concurred.