[Civ. No. 19942.   Second Dist., Div. Three.   July 23, 1954.]

ROBERTS DISTRIBUTING COMPANY, Appellant, v. KAYE-HALBERT CORPORATION (a Corporation) et al., Respondents.

David Ziskind and George DeRoy for Appellant.

Mitchell, Silberberg & Knupp, Chester I. Lappen and George M. Dell for Respondents.

VALLÉE, J.—Appeal by plaintiff from an adverse judgment in an action for breach of contract and conversion. The litigation arose out of an accounting for 103 television sets returned by plaintiff to defendant Kaye-Halbert Corpora-

tion. The issues are between plaintiff and defendant Kaye-Halbert Corporation, referred to as defendant.

Defendant is a California corporation manufacturing television sets in Los Angeles. Plaintiff is a Missouri corporation which served as a distributor for defendant's television sets in St. Louis. Plaintiff had purchased sets from defendant.

In March 1951, plaintiff was about two months in arrears on its open account with defendant in the stipulated sum of $12,904.92. Defendant also claimed that plaintiff was indebted to it in the amount of $1,872.36 for an advertising charge-back. On April 6 an agreement was entered into between Hausfater, president of plaintiff, and Blackman, acting for defendant, whereby plaintiff was to ship 103 television sets to Guarantee-V-Sales in Los Angeles at an agreed price of $21,169.94 and defendant was to give plaintiff credit on its open account. Defendant was to deduct the amount plaintiff owed it and remit the balance. The next morning, April 7, plaintiff shipped the 103 sets. The sets arrived in badly damaged condition. Guarantee-V-Sales re-routed them to defendant. After repairing and reconditioning the sets, defendant resold them and credited plaintiff with $16,500.70, and offset against plaintiff's account the costs of reconditioning, overhead and sales expenses, an advertising charge-back, and the original indebtedness of $12,904.92. Prior to April 6, under an agreement with defendant, plaintiff had sold back a number of sets by shipping them to Jordan Marsh, a Boston distributor.

Plaintiff commenced this action seeking the agreed price of $21,159.98 for the 103 television sets shipped to Guarantee-V-Sales. Defendant admitted that a credit was due to plaintiff for the return of the sets, but pleaded a counterclaim for a net balance of $5,977.21, based on offsets for damages resulting from breaches of express and implied warranties as to the condition of the 103 sets.[1]

---

[1]Figures used by defendant:

| | Credits | Debits |
|---|---|---|
| Due from plaintiff on its original indebtedness .. | | $14,924.02 |
| Money from resale of the 103 sets . .... | $16,500.70 | |
| Materials, labor and services in reconditioning the sets .. .... .. .... ................ | | 3,902.79 |
| Costs involved in selling the sets............... | | 3,651.10 |
| | $16,500.70 | $22,477.91 |
| Net balance owing by plaintiff................. | $ 5,977.21 | |

The court found that: the 103 sets were warranted by plaintiff to be new merchandise in the original cartons as originally packed by defendant and were warranted to be in good and marketable condition; they were not sold to defendant "as is"; they were not delivered in the original cartons as originally packed by defendant but had been removed from their original cartons and packing and had been repacked "in a grossly inadequate and improper manner"; they had been used or tampered with and parts had been removed by plaintiff; they were unmerchantable; defendant spent $7,553.89 in placing the sets in salable condition and in selling them; defendant sold them for $16,500.70 and realized $8,946.81, which was their reasonable value at the time of their delivery to defendant; crediting the $8,946.81 to the balance of $14,085.22 owing by plaintiff to defendant there is a balance of $5,138.41 due from plaintiff to defendant. The court also found that: if the sets had been in the original cartons they would have had a fair value of $21,169.94; in their damaged condition they had a fair value of $8,946.81 to defendant's damage in the sum of $12,223.13; adding $12,223.13 to the $14,085.22 which plaintiff owed defendant and crediting the contract price of $21,169.94 to said balance plaintiff owes defendant $5,138.41. Judgment was for defendant for $5,138.41 from which plaintiff appeals.

The questions here center around two points: (1) the terms of the contract to sell back the 103 television sets; and (2) the items and their costs, if any, to be deducted from the credit due plaintiff.

The first specification of error is that there is no evidence to support the finding that the television sets were warranted by plaintiff to be new merchandise in the original cartons as originally packed by defendant.

Section 1732 of the Civil Code defines an express warranty as follows: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. . . ." █ The statutory definition of an express warranty includes any promise of the seller relating to the goods. (46 Am.Jur. 494, § 313.)

█ No technical or particular words are necessary to create an express warranty, and whether the word "warrant" was used in the parties' dealings is immaterial. (*Stott* v. *Johnston*, 36 Cal.2d 864, 870 [229 P.2d 348, 28 A.L.R.2d

540].) ■ The existence of the warranty may be inferred from the affirmation of a fact which has induced the purchase and on which the purchaser was intended to and did rely. (*International Shoe Co.* v. *Lipschitz*, (Mo.App.) 72 S.W.2d 122, 125.) ■ If the facts or affirmation relied on to prove an express warranty rest wholly or partly in parol, it is the province of the trier of fact to determine whether they amount to an express warranty. (*Webster* v. *Klassen*, 109 Cal.App. 2d 583, 591 [241 P.2d 302]; 46 Am.Jur. 501, § 321.)

■ A provision that the buyer takes the article in the condition in which it is, or "as is," prevents representations of the seller, although relied on by the buyer, from constituting express or implied warranties. (46 Am.Jur. 501, § 319.) ■ But disclaimers of express and implied warranties are construed strictly against the seller. (*Wade* v. *Chariot Trailer Co.*, 331 Mich. 576 [50 N.W.2d 162, 165]; *Deere & Webber Co.* v. *Moch*, 71 N.D. 649 [3 N.W.2d 471, 474, 139 A.L.R. 1270]; 77 C.J.S. p. 1151, § 312, p. 1166, § 317.)

In March 1951, Duane Larrabee on behalf of defendant called on Hausfater with respect to the delinquent account. Hausfater testified to the following: Larrabee took an inventory of plaintiff's stock of defendant's sets. All of the sets, except 12 or 13 which were in the showroom, were in their original cartons in the warehouse. When Larrabee took the inventory he looked at the outside of the sealed cartons. The inventory revealed that plaintiff had 244 of defendant's sets.

On April 6, Blackman telephoned Hausfater and arranged to purchase 103 sets. The only direct evidence of the terms of the sell-back contract was the testimony of Hausfater. He testified that Blackman told him defendant was buying from plaintiff 104 television sets;[2] he (Blackman) gave him the model numbers and the style of each set. That night Hausfater took the sets out of stock "which were in the original cartons, with the exception of about five sets or six sets that were in our showroom," packed them and shipped them the following morning. Hausfater testified that the 103 sets were sold "as is" in their "original cartons"; that with the exception of five or six sets they had never been opened; and that Blackman knew the sets were in their original cartons and had never been opened.

---

[2]Plaintiff did not have enough sets of these particular stock models, so he shipped 103. There is no dispute about the number.

■ Hausfater knew what the phrase "in their original cartons" would connote to defendant. The reasonable and necessary implication and meaning of the term "original cartons" as used by Hausfater was that the sets were new merchandise in their original cartons as originally packed by defendant and that they were in good and marketable condition. The evidence supports the finding of an express warranty.

In view of our conclusion that plaintiff's liability may be sustained by reason of its breach of an express warranty, it is unnecessary to discuss its claim that the finding of an implied warranty is unsupported by the evidence.

Plaintiff contends the court erred in admitting in evidence certain letters sent from defendant to plaintiff. It asserts the letters contained self-serving, hearsay statements of defendant as to warranty, resale, and deductions and that their contents were . promptly and emphatically denied by plaintiff. The court stated it was admitting them for the purpose of proving they were sent and received. On April 6, 1951, the same day that Blackman called Hausfater, he wrote him a letter.[3] This letter was acknowledged by plaintiff's office manager on April 18.[4] Blackman wrote Hausfater again on April 20.[5] Hausfater answered this

---

[3] "Confirming my conversation with you on the telephone today, it is my understanding you are shipping back to Los Angeles, for sale, the following merchandise: [Models and their quantity.] This makes a total of 104 pieces. You will send the invoice to me and after I collect the money from the sale of these pieces the Kaye-Halbert Corporation will retain the amount due on your open account and remit the difference to you immediately."

[4] "It was our understanding that any deal made at the low price quoted was to be for cash, therefore, we believe, that the balance due us should be in our hands upon receipt of sets."

[5] "The 104 pieces you sent Guarantee-V-Sales were refused by them because of their arrival in bad condition, due apparently to the fact that many of the sets were not protected by original packing. Guarantee-V-Sales rerouted these sets to our warehouse. This letter is written to advise the course we must pursue in disposing of these sets. We will endeavor to sell as much of this merchandise as we can at the prices outlined in your bill. Proceeds of these sales will be retained by us and credited to your long past due account. Your permission will be requested prior to sale of merchandise at less than prices you outline, where this is necessary. Excess moneys received by us over and above your account with us will be remitted to you immediately. We will charge you back with freight on this shipment and those additional charges we incur in sale of this merchandise as well as any rework expense necessary to bring this merchandise to salable condition. Co-operative advertising expenditures based on original billing on this merchandise, made by us, must also be deducted from your invoice figures."

letter on April 24.[6]

From the letters, it may clearly be seen that plaintiff did not deny defendant the right to collect the money from the sales, retain the amount due on plaintiff's open account, and then remit the difference. In Hausfater's letter of April 24, he stated that the sale was effected pursuant to defendant's letter of April 6, "You [Blackman] promised immediately upon collection of the moneys to retain the amount owing to you on open account and to remit the difference to me immediately." This was an admission of acceptance as to the manner of payment: excess moneys received by defendant from the sale of the sets, over and above plaintiff's open account, would be remitted. There was no error in admitting the letters in evidence.

The court found that defendant was compelled to and did expend $7,553.89 in repairing and packing the sets in salable condition and in selling them. Plaintiff contends the finding is unsupported by the evidence. The $7,553.89 is made up of $3,623.79 for repairs, $279 for repacking, and $3,651.10 for administrative and selling expense.

We shall first consider the items for repairs and repacking. Plaintiff says the finding as to repairs and repacking is erroneous because it is based on opinion evidence rather than actual costs, that the records of actual costs were available and not produced, and that the witness was not properly qualified to testify as an expert.

In an action against a seller for a breach of warranty of quality, the purchaser may recover damages for money and time spent in reasonable efforts to make the goods conform to the warranty under which they were sold. Because it may be assumed that a buyer will spend time and money in reasonable efforts to make defective goods conform to their warranty, the amounts incurred or paid for that purpose

_____

[6] "'This is to answer your letter of April 20, 1951, the contents of which are totally unacceptable to me. The sale and shipment of the 103 television sets, which was effected on April 7, 1951, pursuant to your letter of April 6, 1951, is a closed transaction. I took a terrible loss on these sets just for the purpose of liquidating your indebtedness, and to get ourselves into a more liquid position. I made the sacrifice only at your urgent insistance and on your advice. You assured me that the sale was complete; you instructed me to ship to Guarantee-V-Sales and you asked me to bill your company for the sale; all of which I did in accordance with your implicit instructions. You promised immediately upon collection of the moneys to retain the amount owing to you on open account and to remit the difference to me immediately. Now you come at me with a letter asking me to take an even greater licking; well, I simply cannot afford it.'"

should be considered as being within the contemplation of the parties at the time of the original contract of sale. Since such damages proximately result from the breach of warranty and can be ascertained with reasonable certainty, they are allowable. (*Grupe* v. *Glick*, 26 Cal.2d 680, 689-690 [160 P.2d 832].)

The only evidence as to the cost of repairing and repacking consisted of an "Analysis of 103 Sets Returned from Roberts," prepared by Varten Hachigian, and his opinion testimony. Hachigian, the assistant to the president and plant manager of the service division and supervisor of defendant's traffic department, testified on direct examination that approximately four months before the trial, or nearly 13 months after the sets were repaired, he made a detailed written analysis of the cost of repairing each one of the 103 television sets. He made it from the original inspection reports, the cost of cabinets, the labor cost for repairs, the part costs, and sometimes from the original invoice the cabinet maker charged defendant for the cabinets. Defendant then offered the analysis in evidence, whereupon plaintiff took Hachigian on *voir dire*. On *voir dire* examination, he testified: "Q. Mr. Hachigian, you didn't have any records of time sheets showing exactly how much time was devoted to each one of these sets? A. Yes, I do. Q. Where are those records? A. Unfortunately we had a change in personnel and administration, and many of the records were mishandled. Q. Then you don't have them now? A. I can't present them all this minute, but I believe they could be presented. Q. You think they are available? A. Unfortunately, I didn't consider it important enough to bring them with me. Q. But do you think they are available? A. I believe they are."

Plaintiff objected to reception of the analysis in evidence on the ground it was not the best evidence "of any time costs or labor costs." Hachigian then stated the analysis was an expert's opinion as to how much time it would take to repair the sets. Plaintiff again objected to reception of the analysis "as a self-serving statement."

Later Hachigian testified as to the way he prepared the estimate: "I took the inspection report of the sets as they came in, as was prepared by the receiving department, showing the damages and the parts missing. Taking those into consideration, parts—we have known figures for that, so that wasn't estimated. And cabinets that were replaced, we know our cost on those. So I used those. But, as far as labor is

concerned on cabinet repairs, since we have had a lot of experience in time and labor on repairing cabinets, I used that information to determine the cost of repairing cabinets. As far as repairing the chassis of the television sets, we have also been in the repairing and servicing of chassis for a long time and I used known time costs and labor costs for that. I want to mention the fact that on the repair of chassis we used the very same figure of $4.50 a set, which is far below what most of them cost." The analysis was then admitted in evidence over plaintiff's objection that it was self-serving and not the best evidence.

It is proper for the court, in the exercise of its discretion, to accept the best evidence which the case affords. (10 Cal.Jur. 851, § 132.) The court was warranted in concluding that the records were not available. ▆▆ The general rule, when a question is to be determined from prepared data, is that where possible the data to establish a fact must be laid before the court. A necessary modification of this rule is that when these data may not thus be presented to the court the opinions of persons qualified on the subject are admissible. (10 Cal.Jur. 964, § 221.) ▆▆ The question of Hachigian's competency was for the trial judge. There was no error in admitting the analysis in evidence.

Plaintiff contends there was no evidence that any administrative or sales expenses were actually incurred by reason of the resale, that there was only Hachigian's statement of how much was charged against plaintiff on the account, and that the court miscalculated that amount in the findings.

Hachigian testified that the reasonable value of the selling and administrative costs on the sale of the 103 sets was "about fifteen percent. . . . Fifteen percent of the sales price." When asked what the cost would be to defendant in dollars and cents, he replied "$3,651.10." He was asked to explain how that was computed and he answered, "On the basis of our known expenses, 15 percent of the $21,000.00 price asked by Roberts was the figure we used in estimating our administrative and sales expense." Plaintiff asserts there is no evidence that it agreed defendant might charge it for administrative and sales expenses. Hausfater testified the agreement was for "no deductions of any kind." It also contends that the 15 per cent formula was improperly applied in that if it were used it should be 15 per cent of $16,500.70 for which the defendant claimed to have resold the 103 sets, or $2,475.11. Defendant argues that the $3,651.10 is to be

added to $21,169.94, and the total fair market value in April 1951 would have been $24,821.04. This addition is made on the premise that $21,169.94 was the *net* value of the sets; that defendant could have sold the sets so as to net $21,169.94. However, $3,651.10 is 15 per cent of $24,340.67, which figure is not found anywhere in the record. Hachigian's testimony was not evidence of any expense actually incurred. It was merely an estimate of the percentage of sales price customarily expended on sales and administration and an attempt to arbitrarily apply that percentage to this transaction. When he explained his estimate he indicated that he was not reporting an actual cost but estimating a cost from figures not involved, or found, in the transaction. Defendant was not in the business of taking sets back and reselling them. This was a special situation. There was no showing that there were any sales or administrative expenses, in making the special resale.

Compensatory damages can be allowed for only the damage that may reasonably be supposed to have been within the contemplation of the parties at the time of entering into the agreement. (14 Cal.Jur.2d 660, § 32.) To warrant a recovery for expenses there must be evidence from which the amount to be allowed can be properly determined. (25 C.J.S. 634, § 91.) For administrative and sales expenses to be recoverable, such damages must be proved as damages actually sustained. (See *Grupe* v. *Glick*, 26 Cal.2d 680 [160 P.2d 832]; Civ. Code, § 3358.) On the record it was error to award defendant $3,651.10 for administrative and sales expenses.

The court found that at the time of the agreement of April 6, 1951, plaintiff was indebted to defendant in the sum of $14,085.22; while the parties at the commencement of the trial had stipulated plaintiff owed defendant, exclusive of any alleged sum for advertising charge-back, $12,904.92. The parties agree the trial court must have allowed the difference of $1,180.30 for an advertising charge-back. Plaintiff asserts the court erred in admitting evidence of a secondary and self-serving nature as to plaintiff's obligation to pay back an advertising allowance, and that, in any event, the court miscalculated the amount of the allowance.

In the course of defendant's dealings with its distributors, there were a number of agreements or understandings. For each distributor, defendant kept three separate accounts: one for the merchandise, another for advertising, and the third

for parts. Defendant issued separate credit memos and separate billings for each account. In the special advertising account, defendant was charged with 4 per cent of the cost of sets and the distributor was charged with 2 per cent of the cost. The distributor paid for advertising defendant's sets in local newspapers and was given credit for such expenditures against the advertising account. Plaintiff had received credit for advertising the 103 sets that were returned. Defendant claimed that since it took back the sets and would have to allow other distributors credit for further advertising, it would charge back the advertising credit allowed plaintiff. It claims such charge-backs were customary. Plaintiff contends there was an express agreement for "no deductions of any kind" and that defendant did not make new advertising allowances to other distributors on these sets.

Over plaintiff's objection, Kaye, defendant's president, was asked whether there is an established practice for an adjustment in the advertising fund when sets are returned by a distributor. He said it is generally the practice to do so, "to give a new advertising allowance to the new purchaser." He said he was only "vaguely familiar" with the earlier Jordan Marsh transaction and could not tell whether Jordan Marsh was given an advertising allowance or whether a charge-back was made to plaintiff. He testified that in connection with the 103 sets that were returned to defendant an advertising charge-back was made, but he didn't know the exact amount. He did not state what adjustment had been made, or when.

The only evidence adduced by defendant with respect to the amount of the advertising charge-back was in the testimony of Hachigian. It was stipulated that Hachigian's testimony would be the same as Kaye's, relative to the existence of a charge-back custom. He testified that defendant was "charged back" in the Jordan Marsh transaction. He was shown certain documents which he identified as "subsidiary ledger sheets" from the posting machine and which were made under his supervision; but they were not offered in evidence. Therafter he testified, over plaintiff's objection, from the documents. He was asked what the figure $1,872.36 was and he answered, "There is a charge here of $1,872.36 for advertising "charge-back." There was no evidence that defendant actually incurred any advertising expense in reselling the sets, nor was there any evidence that plaintiff knew of any custom.

Defendant's witness stated the charge for advertising charge-back was $1,872.36. However, his testimony did not reveal any basis for determining the amount. The court allowed defendant $1,180.30. There is no mention of that sum in the record and no evidence on which it can be calculated. Plaintiff asserts the judgment awarding defendant a charge-back of $1,180.30 must be deemed to rest upon testimony concerning a custom for which no foundation was laid and upon a calculation for which there is no evidence in the record. As to the amount, defendant agrees the mathematical computation is not correct, but argues that according to its computations the arithmetical oversight is not a sufficient basis for reversing the judgment. It assumes that the price plaintiff originally paid defendant for the 103 sets was $21,169.94 plus 20 per cent of that amount, or a total of $25,403.93; that the proper 4 per cent charge-back should have been $1,016.16, or $164.14 less than the $1,180.30 allowed by the court, and that the rule of *de minimis* applies.

The foundation for the introduction of evidence of custom or usage is a showing of a series of acts of a similar character performed at different times. (*Ames Mercantile Co.* v. *Kimball S. S. Co.*, 9 Cir., 125 F. 332, 335.) Evidence of a habit of doing a thing in the course of business is, if clearly shown as a definite course of action, admissible as indicating that, on a particular occasion, the thing was done as usual. (31 C.J.S. 881, § 180.) Evidence of the doing of an act at one time is incompetent to prove a custom to do so. (*Wilson* v. *Travelers' Ins. Co.*, 183 Cal. 65, 70 [190 P. 366].) A person is not bound by a custom or usage unless he had actual knowledge thereof, or it is so general or well-known in the community as to give rise to the presumption of such knowledge. (*Robertson* v. *Dodson*, 54 Cal. App.2d 661, 664 [129 P.2d 726]; 25 Cal.Jur. 419, § 4.)

The only evidence on the amount of the advertising allowance made by defendant was that it set aside 4 per cent of the cost of the television sets for advertising. Defendant did not prove the original cost of the 103 sets that were returned or of those sent by plaintiff to Jordan Marsh, nor what 4 per cent of the two transactions is. The court permitted defendant's witness to read into the record a statement that defendant had charged back to plaintiff $1,872.36 for advertising, but the court awarded damages on that account for only $1,180.30. If these figures constituted a 4 per cent advertising allowance, they would refer

to sets sold for $46,809. and $29,507.50, respectively. There was no evidence that the sets were sold at either of these prices. The allowance of $1,180.30 for an advertising charge-back is without evidentiary support.

The court found that defendant sold the 103 sets as reconditioned sets for $16,500.70. Plaintiff contends that $16,500.70 is mathematically incorrect as to the actual amount received, and is not the fair market value of the sets because: (1) at least one of the sets was given away free, (2) defendant failed to account for all the sets, and (3) the amount stated did not include other intangible considerations.

In a case of breach of warranty of quality, the general measure of damages "is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty." (Civ. Code, § 1789, subd. (7).)

▉▉▉ The evidence of the prices received by defendant on the resale of the 103 sets was presented in a tabulation of set numbers and prices. The tabulation showed a figure of $16,500.70 as having been the total amount received from the sale of all the sets. Kaye, president of defendant, testified that one of the sets was delivered to a dealer without charge, probably as an advertising credit, and it was also possible there were other sets for which the dealer might have been given some credit so that the price was reduced for some reason. He testified that a set listed on the exhibit was sold to someone else at a date prior to the time the 103 sets were sent back, and that the records were inaccurate.

In March of 1950, plaintiff became a distributor of defendant's televisions sets. Plaintiff had bought about 2,000 from March 1950 to June 1951; however, after December 1950, it had purchased only two sets. Of the 103 sets involved in this litigation, 100 had been manufactured and shipped to plaintiff between October 6 and November 28. The remaining three sets had been shipped prior to October 1st. Plaintiff had most of the sets five months before it returned them.

Hausfater testified that the prevailing prices of the sets were lower in April 1951 than what he had paid for them and that plaintiff resold them at a lower price than it had paid for them. Kaye testified that the prices of the 103 television sets were the same in March 1951 as in November 1950. However, the documentary evidence introduced by defendant

showed that seven of the eight models had declined in price during that period.[7] It is apparent the court accepted the sum of $16,500.70 found in the tabulation, as being the total amount defendant received from the sale of the 103 sets. In view of the fact that the tabulation was incorrect and incomplete and that seven of the eight models had declined in price during the five months between November and April, it was error for the court to adopt defendant's tabulation as a full and correct accounting.

The finding that plaintiff expressly warranted the 103 sets were new merchandise in the original cartons as originally packed by defendant and were to be in good and marketable condition, is supported by the evidence. Insofar as the finding that defendant was compelled to and did expend $7,553.89 includes $3,902.79 that defendant spent in repairing and packing the sets, it is supported by the evidence; but insofar as it includes $3,651.10 for administrative and selling expense, it is not supported by the evidence. The finding that on April 6, 1951, plaintiff was indebted to defendant in the sum of $14,085.22, insofar as it includes $1,180.30 for an advertising charge-back, is not supported by the evidence. The finding that defendant realized $16,500.70 from the sale of the reconditioned sets is not supported by the evidence.

Reversed.

Shinn, P. J., and Wood (Parker), J., concurred.

[7]

| Model No. | No. of Sets | Nov. 1st Per Unit | Price Total | March 15th Price | Credit Given | Total Credit Given |
|---|---|---|---|---|---|---|
| 731M | 15 | 177.45 | 2,611.75 | 175.61 | 160.98 | 2,414.70 |
| 733M | 25 | 196.32 | 4,908.00 | 194.02 | 184.23 | 4,605.75 |
| 734W | 1 | 237.97 | 237.97 | 234.57 | 227.23 | 227.23 |
| 033M | 5 | 222.70* | 1,113.50 | 220.32 | 223.23 | 1,116.15 |
| 737 | 25 | 228.75* | 5,718.75 | 226.07 | 229.23 | 5,730.75 |
| 734M | 10 | 243.92 | 2,439.20 | 240.52 | 232.23 | 2,322.30 |
| 735 | 10 | 232.05* | 2,320.50 | 228.77 | 224.23 | 2,242.30 |
| 236 | 12 | 220.15** | 2,641.80 | | 209.23 | 2,510.76 |
| | | | 21,991.47 | | | 21,169.94 |

*January 2, 1951, prices.    **Three sets were shipped prior to October.