[Civ. No. 21454. Second Dist., Div. Three. Aug. 1, 1956.]

HENRY MILLER et al., Respondents, v. GENIE HILLMAN STULTS, Appellant.

Cornish & Cornish and Francis T. Cornish for Appellant.

Champion & Quinn, Lawton D. Champion and Roland E. Iversen for Respondents.

VALLÉE, J.—Appeal by defendant from an adverse judgment in an action for money alleged to be owing for labor and the use of equipment in summer-fallowing agricultural land in Monterey County.

Prior to May 1944 the land was owned by H H H Land and Livestock Company. Defendant acquired the land in May 1944. Plaintiff Henry Miller and his father farmed the land from 1933 to 1935; Henry and his brother, Raymond, farmed

it from 1935 to 1939; and Henry farmed it from 1939 to October 1, 1944. The land was planted to grain. From the time the Millers began farming the land in 1933 part of it was planted, called in the record "cropped," one year and summer-fallowed the next. Whatever was summer-fallowed one year was cropped the next.

On October 1, 1944, defendant as lessor and plaintiff Henry Miller as lessee entered into a written lease of the land, pertinent parts of which are set out in the margin.[1] The

[1]Lessor does hereby lease, demise, and to farm . . .:

"Miller field, 400 a, Willis Springs field, 100 a, Eltinge and oil well field 170 A, Harlen Springs 64 A.

"Eltinge and oil well field in summer fallow 1944 Miller field, Willis Springs field to be summer fallowed 1945

"Harlen Springs field, Eltinge field and oil well field to be summer fallowed 1946.

". . . To Have and To Hold the same for the term of *two* years, commencing *October first 1944*, and ending, without written notice on *October first 1946*.

". . . Lessee further covenants that he will till and cultivate said premises in a good farm-like manner. That he will in due and proper season, sow said premises to grain and will farm, harvest and haul the same at his own cost, charge and expense as soon as the same is suitable for harvesting. That he will immediately upon harvesting the same, as and for the yearly rental of said premises, deliver to said Lessor at *Paso Robles, Calif* in the *Farmers Alliance* warehouse, unless otherwise agreed upon in writing, *one-fourth* part of all grain crops, *one-fourth* part of all hay crops, excepting contract hay baled, raised upon said demised premises, to be delivered inside of hay mow or other place agreed upon in writing at the ranch headquarters, inside of barns or sheds, piled in good order, before hauling their own hay.

"All land covered by this lease to be summer-fallowed in a good farmer-like manner, unless agreed upon in writing, or this lease is null and void.

"'All unharvested grain, stubble, straw, pasture and water are hereby reserved by Lessor exclusively, and the right to use the same, also right to pasture, drive cattle along all roads and run livestock on summer-fallowed land.

"Lessee agrees to have all fields cleared by the First of September or as soon as possible and to harvest all grain on this ranch first unless agreed upon in writing.

"The right to sow and pasture Sudan grass on summer-fallow is reserved by Lessor.

"The Lessor has right to enter and pasture livestock on summer-fallowed ground.

"TIME IS OF THE ESSENCE OF THIS CONTRACT, WHICH (INCLUDING THE TERMS AND CONDITIONS SET FORTH ABOVE) EMBODIES THE ENTIRE UNDERSTANDING AND AGREEMENT BETWEEN THE PARTIES. NO AGREEMENT MODIFYING OR SUPPLEMENTING THIS CONTRACT SHALL BE VALID OR BINDING UNLESS EVIDENCED BY A WRITING SIGNED BY BOTH OF THE PARTIES HERETO."

term of the lease was two years from October 1, 1944, to October 1, 1946. The lease recited that 170 acres were in summer fallow; that 500 acres were to be summer-fallowed in 1945; and that 234 acres were to be summer-fallowed in 1946. The yearly rental was one-fourth of all crops. The lease said, "All land covered by this lease to be summer-fallowed in a good farmer-like manner, unless agreed upon in writing, or this lease is null and void." The lessor reserved the right to sow and pasture grass and run livestock on summer-fallowed land.

Sometime in 1945 or 1946 defendant told plaintiff Henry Miller "any time we two [plaintiffs] could take in more land— go ahead and do it. . . . Anything within the fence surrounding it." On October 1, 1946, the end of the term of the lease, 234 acres were in summer fallow. After October 1, 1946, plaintiffs remained in possession continuously until October 1, 1953.

Plaintiff Henry Miller testified: "Q. [BY MR. CHAMPION, attorney for plaintiffs] : And then, after the lease expired, did she [defendant] say anything about renewing it? A. I asked her, well—her and Walter [defendant's husband] both on probably 3 or 4 different occasions, if we hadn't better draw up a new lease and they said, well, it is all right. We are getting along O K—go ahead the way you are—and that is the way it has been ever since then. . . . Q. And after this lease expired, what did they say—still go ahead? A. Yes, after that 2 years was up, well, I asked them there—or probably 3 or 4 times if we hadn't better make a new lease when that one expired, and they said, well, we are doing all right. We are getting along. Never any argument, or any trouble with them. Q. You went ahead? A. It was just stalled off and postponed, and there was never any—— Q. And you had no other written lease from that time until '53? A. Never have had."

Defendant testified: "Q. [BY MR. CORNISH, attorney for defendant] : Now then, Mrs. Stults, October of 1946, or at about that time, did you and Mr. Henry Miller further discuss the leasing of the property? A. We were going to make up another lease about '46 or '47, somewhere around in there—for no reason other—I mean—everything was based on the same idea of this lease here. Q. If I might—— A. Neither one of us got around to signing the thing because we both figured that that lease was exactly the same thing as the one we already had and the idea was we were going to carry

this one right on through. The other one was just the same thing. . . . Q. Now, over how long a period of time did you and Mr. Henry Miller discuss this second lease? A. Oh, we drew the thing up and all that, and everything; both of us looked at it and I don't know. Well, actually it was the same. There wasn't any difference between the two of them. The two of us—we just didn't get around to signing the thing—it was just an idea that we just—it was signing a same thing we already had. Q. In these conversations, did Mr. Miller state that he wanted any of the provisions of the original lease changed? A. No.''

Beginning sometime in 1945, land in addition to that covered by the written lease was cropped and summer-fallowed from time to time and some was taken from that previously farmed. In 1948 the place of delivery of the sacked grain was changed at defendant's request. In 1950 the rent was increased from one-fourth of the crop to one-third. On August 26, 1953, defendant gave plaintiffs notice of termination of the tenancy effective October 1, 1953, at which time plaintiffs quit possession. On October 1, 1953, 459 acres were in summer fallow, the work having been done in the spring of 1953.

. The action is to recover the value of the labor, use of equipment, and services of plaintiffs in summer-fallowing the 459 acres, which they allege to be $5,000.

After the commencement of this action defendant filed an action in the Superior Court of Monterey County, naming Henry Miller and Raymond Miller as defendants, to recover the reasonable value of grain which she alleged the defendants (plaintiffs here) had failed to deliver. In the complaint in that action defendant alleged: ''That plaintiff is the owner of certain farming land in the County of Monterey; that prior to the 1st day of October, 1951, plaintiff and defendants entered into an oral agreement; that in accordance with said agreement, plaintiff promised defendants to permit defendants to farm plaintiff's land in Monterey County, commencing October 1, 1951, for a period of one year, and defendants promised to plaintiff to pay as rent for said land one-third of the wheat, barley and hay crops raised on said land, and to deliver one-third of said crops to plaintiff's other ranch in the County of San Luis Obispo within five days after harvest of said crops.'' It was stipulated at the trial of the present action that the land involved in the Monterey County action is the same land as is involved in this controversy.

The court found: on October 1, 1953, defendant became indebted to plaintiffs in the sum of $4,590 for labor, use of equipment, and services of plaintiffs done at defendant's request; the lease of October 1, 1944, contained no express provision for compensating the tenant for summer fallow on the land at the conclusion of the term of the lease or for the summer fallow plaintiffs had already put on the land at the time the lease was signed; after the lease expired, the parties proceeded for years under successive unwritten agreements with the summer-fallowing of much larger acreages in odd-numbered years than in even-numbered years; no written lease was entered into since the signing of the lease for the two-year term in 1944; the two-year lease terminated on October 1, 1946, and was never renewed or extended from year to year or at all, and after its termination plaintiffs farmed the land under successive one-year unwritten tenancies until October 1, 1953; the custom in the locality in which the land is located was, in the absence of an express, written agreement to the contrary, when there was no summer fallow on the land when he took it and the land was in summer fallow prepared by the tenant when the landlord took the land away from the tenant, that then the tenant should be paid the reasonable value for the summer-fallowing;[2] the

---

[2] The finding with respect to custom reads: ''The custom of the Parkfield area of Monterey County, California, in which the lands concerned are located was that, in the absence of an express written agreement to the contrary, when there was no summer fallow on the land when he took it, and the land was in summer fallow prepared by the tenant when the landlord took the land away from the tenant, that then the tenant should be paid the reasonable value for the summer fallowing. The custom was, in taking a piece of land to farm, there being then no summer fallow on it, to summer fallow the land, and, therefore, the first year the tenant summer fallows, and the next year he sows the land, and he continues on the same until the expiration of time or notice, and it was then the custom of the country (or area) with the termination of the agreement or lease, whichever you would have, that if the landlord sold the place, or for some reason took the land away from the tenant, the tenant should be paid the going price, whatever that is, for summer fallowing. The custom was further, in the absence of a written agreement or lease to the contrary, that a tenant going for the first time onto land already summer fallowed by someone else pays for the value of the summer fallow then on the land.

''The custom was further that without either express agreement to the contrary, or money payment for summer fallow performed by him, a tenant who summer fallowed in one year of a year-to-year arrangement was entitled to crop in the following year the summer fallowed land.

''All of the custom of the area set forth in these findings was known by all parties to this action when the written lease dated October 1, 1944, was executed, and at all times subsequent thereto.''

custom was known by all parties on October 1, 1944, and at all times subsequent thereto; the parties, after the expiration of the written lease, actually contracted from year to year without reference to the written lease and in the light of the custom; the custom was part of the oral, unwritten contracts of the parties under the year-to-year tenancies; the successive year-to-year tenancies under which plaintiffs farmed the land after the expiration of the written lease were by express, oral agreement between the parties and not a mere holding-over after the expiration of the written lease. Judgment for plaintiffs followed, from which defendant appeals.

The assignments of error are: 1. The evidence is insufficient to support the findings. 2. The parties intended to create a tenancy from year to year and did not intend to, and did not, create a separate tenancy each year or a tenancy under terms with respect to the obligations to summer fallow different from those written in the lease; they intended throughout their relationship to deal under the terms of the written lease. 3. The court erred in receiving evidence of custom. 4. The custom was not established.

Civil Code, section 1945, provides:

‘‘If a lessee of real property remains in possession thereof after the expiration of the hiring, and the lessor accepts rent from him, the parties are presumed to have renewed the hiring on the same terms and for the same time, not exceeding one month when the rent is payable monthly, nor in any case one year.’’ Thus it is presumed that at the end of the written lease on October 1, 1946, the parties renewed the hiring on the same terms for one year. ■ The presumption declared by section 1945 is rebuttable. (*Black* v. *Black,* 77 Cal.App. 82, 85 [246 P. 90].) Civil Code, section 1946, in pertinent part provides:

‘‘A hiring of real property, for a term not specified by the parties, is deemed to be renewed as stated in the last section [1945], at the end of the term implied by law unless one of the parties gives written notice to the other of his intention to terminate the same, at least as long before the expiration thereof as the term of the hiring itself, not exceeding 30 days. . . .’’

■ Ordinarily if a tenant holds over after the expiration of the original tenancy, it is on the terms of the original demise except as it may have been or is thereafter modified. (*Woods* v. *Bank of Haywards,* 10 Cal.App. 93, 96-97 [106 P. 730]; *Shenson* v. *Shenson,* 124 Cal.App.2d 747, 752-753 [269

P.2d 170, 270 P.2d 896].) ██ A tenancy from year to year is created where a tenant holds over after the expiration of a former lease for one or more years and pays rent, nothing being said between the parties, no agreement as to the time he shall hold being made. (*Johnson* v. *Foreman*, 40 Ill.App. 456, 460.) The fact that the rent is changed does not affect the presumption that the tenant holds on all the other terms of the original holding. (*Timm* v. *Arvidson*, 58 N.D. 634 [227 N.W. 59, 60-61]; 51 C.J.S. 738, § 136e; 2 Thompson on Real Property, 28, § 975.) In *Timm* v. *Arvidson, supra,* under a statute similar to Civil Code, section 1945, it was held that changing provisions of a lease of agricultural land relating to the furnishing of seed, the payment of the thresh·bill, and the division of grain did not alter the continuity of the holding and did not effect a new agreement creating an estate but only an executed modification of the old lease.

██ If it be shown that a new agreement was made, different in terms from the written lease, such new agreement destroys the implication of a different term which might otherwise be presumed from the subsequent payment of rent. (*Skaggs* v. *Elkus,* 45 Cal. 154, 160; 51· C.J.S. 620, § 73.) Plaintiffs in the present case continued in possession and paid rent, but under what agreement they did so is a question of fact. (*Swithenbank* v. *Wood,* 99 Cal.App. 341, 345-347 [278 P. 496, 279 P. 462]; *Johnson* v. *Foreman,* 40 Ill.App. 456, 460-461.)

██ The court found that at the end of the written lease there was a new agreement and that there was a new one each year thereafter. We· cannot hold as a matter of law that the finding is unsupported. After October 1, 1946, the place of delivery of defendant's share of the grain was changed at her request; one year the grain was bulked instead of sacked; the share rental was increased from one-fourth to one-third; after 1946, with defendant's consent, much more land was farmed by plaintiffs than was included in the written lease—most of it in the four or five years immediately prior to October 1, 1953. Raymond Miller was not named as a lessee in the written lease; defendant served both Henry Miller and Raymond Miller with notice of termination of the tenancy; in the suit in Monterey County defendant named Henry Miller and Raymond Miller as defendants and alleged that prior to October 1, 1951, she entered into an oral agreement with them whereby she promised to permit them to farm the land commencing October 1, 1951, for a period of

one year and they promised her to pay as rent one-third of the crop. Whether these circumstances were sufficient to rebut the presumption created by Civil Code, section 1945—that is whether they are consistent or inconsistent with the presumption—was a question of fact. They were enough to justify the trial court in inferring that during the year October 1, 1952, to October 1, 1953, the period in question, the parties were not operating under the written lease with modifications but under a new agreement. It does not follow from the fact the court could have found from the evidence that the parties were operating under the written lease with modifications that the findings lack evidentiary support.

Over defendant's objections the court permitted three witnesses to testify that in the area in which the land is located it is the custom, in the absence of a written agreement, when the tenant of agricultural land takes land without summer fallow and the land was in summer fallow at the end of the tenancy, that the landlord should pay the tenant the reasonable value of the summer-fallowing. Defendant asserts error. Plaintiffs refer us to Civil Code sections 1646, 1655, and 1656. Civil Code, section 1646, provides:

"A contract is to be interpreted according to the law and usage of the place where it is to be performed. . . ."

Civil Code, section 1655, reads:

"Stipulations which are necessary to make a contract reasonable, or conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary intention."

Civil Code, section 1656, reads:

"All things that in law or usage are considered as incidental to a contract, or as necessary to carry it into effect, are implied therefrom, unless some of them are expressly mentioned therein, when all other things of the same class are deemed to be excluded."

The rules stated in these sections govern the interpretation of contracts which might otherwise be uncertain, not the formation of contracts. (*Townsend* v. *Flotill Products, Inc.*, 82 Cal.App.2d 863, 865 [187 P.2d 466].) Both parties refer to Code of Civil Procedure, section 1870 (12), which provides that evidence may be given on a trial of:

"Usage, to explain the true character of an act, contract, or instrument, where such true character is not otherwise plain; but usage is never admissible, except as an instrument of interpretation."

In *Rabin* v. *Craft*, 100 Cal.App.2d 808 [224 P.2d 843], we said (p. 811):

"Evidence of usage and custom may be introduced as an instrument of interpretation, but may not be used to create a contract."

In *Sharpe* v. *Arabian American Oil Co.*, 111 Cal.App.2d 99 [244 P.2d 83], this court declared (p. 102):

"If the parties have omitted from the agreement something that was so clearly a part of their understanding that the agreement would be unworkable without it, and which would have been incorporated without question if either party had requested it, the missing stipulation will be implied as a part of the agreement. But before this may be done justification, and the necessity for it, must be found in the agreement. Nothing may be added by way of implication except that which is necessary to carry out the intentions of the parties, as derived from the agreement itself and not merely from the circumstances under which it was made. If the agreement, as written, is complete as to the matters which it purports to cover, and is workable, the court will not read into it any stipulation which would add to or detract from the respective burdens or privileges the parties have declared to be their agreement. And, in the construction of such an agreement it will be conclusively presumed that it expresses their entire understanding. . . .

"[P. 104.] Evidence of usage is never admissible except as an instrument of interpretation." *Williams* v. *Elliott*, 127 Cal.App.2d 357 [273 P.2d 953], held that evidence of custom in the roofing trade on the question whether sheet metal work is ordinarily included in a roofing bid was not admissible where the contractor was attempting to introduce such custom to prove that his version of terms of the contract was more probable than that of the owners, and not for purpose of interpretation of the terms of the contract.

For evidence of custom to have potency it must be established that the parties to the contract were aware of the existence of the custom. "It could not be said with any show of reason that they contracted with reference to a custom of which one of the parties was ignorant. 'Evidence of usage is admissible only on the ground that the parties who made the contract were both cognizant of the usage and must be presumed to have made their engagements with reference thereto.' " (*Corey* v. *Struve*, 16 Cal.App. 310, 320 [116 P.

975].) *Latta* v. *Da Roza,* 100 Cal.App. 606 [280 P. 711, 281 P. 655], says (p. 608):

"When a usage is not general in character, but, upon the contrary, is local and confined to a particular trade or occupation, it is binding upon those not engaged in the calling, only, who have either express or implied knowledge of its existence. (27 R.C.L., p. 163, sec. 11.) Customs of special trades and local usages which are limited to certain communities are not presumed to be known to all persons. (Jones on Evidence, 3d ed., p. 714, sec. 464.) To bind one who is not engaged in the trade or occupation which employs the usage relied upon, proof of his actual knowledge of the usage is necessary, unless it is so commonly accepted that the public is presumed to recognize its existence. When the language of a contract is uncertain or ambiguous, evidence of usage applicable to the transaction may be received to explain the intent of the parties. (Sec. 1870, subd. 12, Code Civ. Proc.; 25 Cal.Jur., p. 425, sec. 10.) In the present case, however, the alleged custom of the trade to the effect that a contract to lay pipe does not include a charge for hauling the same, is not binding on the defendants, in the absence of an agreement to the contrary, for the reason that it appears affirmatively without contradiction that they had no knowledge of the existence of such usage. Nor does it appear this alleged usage is of such a character or general prevalence as to require a presumption of common knowledge of its existence. Since the evidence is uncontradicted that the defendants were ignorant of the usage of the trade in so construing the language of the contract, and since, under the circumstances of this case, knowledge on the part of the defendants was necessary in order to bind them to a mere custom, it must be assumed the trial court disregarded the insufficient evidence of usage and rendered its judgment on the affirmative testimony of an independent agreement to pay for hauling the pipe."

In *People* v. *Seymour,* 54 Cal.App.2d 266 [128 P.2d 726], this court stated (p. 274):

"A usage is operative upon parties to a transaction where and only where they manifest an assent to each other that it shall be operative, or where one of the parties knows or has reason to know that the other party intends to be governed by the usage, or where the usage exists in such transactions and is generally known by persons under similar circumstances. (Rest., Contracts, § 247.) It does not appear that either party manifested an intention to be governed by this

alleged usage. No evidence was introduced to show that the alleged usage was so generally known that Tone would be charged with knowledge thereof and no evidence, except appellant's testimony, was offered to prove that there was in fact such a usage. Tone is an actor and, while he testified that he had purchased jewelry on various occasions, it does not follow that he was familiar with the custom of dealers in the jewelry business.'' (See also *Paez* v. *Mutual Indem. etc. Ins. Co.,* 116 Cal.App. 654, 660 [3 P.2d 69].)

So in the case at bar it does not appear that either party manifested an intention to be governed by the asserted custom. There was no evidence that the asserted custom was so generally known that defendant would be charged with knowledge thereof. There was no evidence that defendant knew of the custom. She testified she never heard of it until after October 1, 1953, when plaintiff Henry Miller telephoned her, threatened her with a lawsuit, and said it was going to be based on the custom. Her testimony was not contradicted. Plaintiffs say the trial judge did not believe her testimony and imply that this was evidence of her knowledge. The fact that the judge may not have believed her testimony did not prove she had knowledge of the custom. ''Disbelief does not create affirmative evidence to the contrary of that which is discarded. 'The fact that a jury may disbelieve the testimony of a witness who testifies to the negative of an issue does not of itself furnish any evidence in support of the affirmative of that issue, and does not warrant a finding in the affirmative thereof unless there is other evidence in the case to support such affirmative.' '' (*Estate of Bould,* 135 Cal. App.2d 260, 264 [287 P. 8, 289 P. 15], where the subject is treated at some length.) There was no other evidence in our case. Strangely, plaintiff Henry Miller did not testify to the custom or that he had any knowledge of it. Plaintiff Raymond Miller did not testify. And there is no basis in the evidence for inferring that defendant contracted with reference to the custom. (See *Roberts Distributing Co.* v. *Kaye-Halbert Corp.,* 126 Cal.App.2d 664, 676 [272 P.2d 886].) There was no evidence that defendant was a farmer. (*Cf. Callahan* v. *Stanley,* 57 Cal. 476, 479.) So far as the record shows, defendant was a stranger to farming customs.

Plaintiffs obviously did not introduce the evidence of custom for the purpose of interpreting a contract, but for the purpose of proving a contract with the custom as a provision of it—to add a term to the contract, and that was its effect.

The agreement of plaintiffs was to farm the land. The word "farming . . . includes the cultivation and fertilization of the soil as well as the caring for and harvesting of the crops." (*Corey* v. *Struve*, 16 Cal.App. 310, 317 [116 P. 975].)

Cases relied on by plaintiffs are not factually analogous. In *Callahan* v. *Stanley*, 57 Cal. 476, evidence of custom was admitted to explain the meaning of the word "stubble" as used in a lease. In *Corey* v. *Struve*, 16 Cal.App. 310 [116 P. 975], the lease expressly provided that the land was to be farmed to beets in accordance with the "customs" of a named company, and both parties relied on evidence of custom. *Brett* v. *Vanomar Producers*, 45 Cal.App. 286 [187 P. 758], was a judgment roll appeal. Evidence of custom was held admissible to explain the language of a written contract for the sale of beans. In *Ermolieff* v. *R.K.O. Radio Pictures*, 19 Cal.2d 543 [122 P.2d 3], a written contract gave the defendant the right to exhibit a motion picture in the United Kingdom. Evidence was held admissible to show that according to the custom in the motion picture industry, the United Kingdom included Eire. In *Pastorino* v. *Greene Brothers*, 90 Cal.App.2d 841 [204 P.2d 368], the defendants by a written contract employed the plaintiff to act as captain of a commercial fishing vessel and "in his capacity of Captain . . . to operate and take care of said vessel to the best of his ability at all times." Evidence was held admissible that it was the custom in the fishing industry that the master of a commercial fishing vessel had complete control of the vessel for the term of the contract—in other words, as to what the contract meant. In these cases the evidence was held admissible to construe or define words in a contract.

 The record is barren of any evidence to support the findings that the custom was known to defendant, that after the expiration of the written lease the parties contracted in the light of the custom, or that the custom was part of the oral, unwritten contracts of the parties under the year-to-year tenancies. The court erred in admitting the evidence of custom. The error was clearly prejudicial since the basis of the judgment is the finding of the custom.

Our conclusion obviates the necessity of examining the contention that the custom was not established.

Defendant appealed from the nonappealable order denying her motion for a new trial. The appeal from the order must be dismissed.

The appeal from the order denying a new trial is dismissed. The judgment is reversed.

Wood (Parker), J., concurred.

SHINN, P. J.—I dissent. I think there was justification in the evidence for the findings of the trial court with respect to the custom. I do not think it was necessary that there should be direct evidence that the parties knew of the custom. The Restatement, Contracts, section 248, page 352, says: "Where both parties to a transaction are engaged in the same occupation, or belong to the same group of persons, the usages of that occupation or group are operative, unless one of the parties knows or has reason to know that the other party has an inconsistent intention." There was evidence that it was "the custom then of the country, with the termination of the agreement or lease, whichever you would have, that we always figure that if they sell the place or for some reason they take it away from you, why we always figure they should get paid the going price whatever that is, for summer fallowing." The witnesses were testifying to a custom applicable to a district in which summer fallow was the rule. Defendant acquired the land in May, 1944. Plaintiffs continued to farm it until 1953 and they summer-fallowed it as they had agreed to do. Their agreements from year to year, as found by the court, did not purport to define the rights of the parties in the circumstances that developed upon termination of the tenancy. The custom with respect to summer fallow was of the very essence of the relationship of the parties in the absence of any agreement inconsistent with the custom. It was but a reasonable and natural custom that a tenant of dry farmed land who expected his tenancy to continue should either be permitted to crop land that he had summer-fallowed or receive compensation for his work.

Defendant had permitted plaintiffs to farm her land for nine years. This was sufficient to warrant a presumption of fact that she had knowledge of the custom, and plaintiffs could scarcely have been ignorant of it in view of their long experience of farming in the area. To my mind it seems more reasonable for the court to have inferred that the parties had knowledge of the custom than to have inferred the contrary.

The judgment is an eminently fair one and I think it should be affirmed.