[Civ. No. 24973. Second Dist., Div. One. Aug. 18, 1961.]

G & P ELECTRIC COMPANY, INC. (a Corporation), Plaintiff and Respondent, v. DUMONT CONSTRUCTION COMPANY et al., Defendants and Respondents; HARRY L. BUTZBACH et al., Defendants and Appellants.

Harry L. Butzbach and Roberta S. Butzbach, in pro. per., for Appellants.

Roy J. Brown for Plaintiff and Respondent.

Donald A. Jones for Defendants and Respondents.

FOURT, J.—This appeal is on a settled statement in accordance with rule 7 of the Rules on Appeal. For convenience, the parties will be designated herein as follows: G & P Electric Company, Inc., as ''G & P''; Dumont Construction Company, et al., (a copartnership consisting of James P. Howard, Jr., and Pete Dumont), as ''Dumont''; and Harry L. Butzbach and Roberta S. Butzbach as ''Butzbachs.''

A résumé of some of the facts is as follows:

The Butzbachs, by written contract, engaged Dumont, a licensed general building contractor, to build a home for them. The contract called for the house to be constructed in accordance with certain plans and written specifications.

G & P Partnership, plaintiff's predecessor, was engaged by Dumont under a written subcontract to do the electrical work for the contract price of $2,262.

During the course of the work the Butzbachs, in four separate instances, signed work orders directing G & P to perform additional work (hereinafter referred to as ''extras''), which was not included in G & P's subcontract with Dumont. The first of the four work orders was also signed by Dumont. In each instance the agreed cost of the extras was set forth in the work order.

G & P was not fully paid for its work. In G & P's first amended complaint it sought in the first cause of action a personal judgment against Dumont and also the imposition of a mechanic's lien upon Butzbachs' property to satisfy the balance it claimed to be due for labor and materials contributed to the over-all improvements, the amount of which was $1,291.55. It was alleged in the second cause of action that on or about August 6, 1956, G & P entered into a written contract with Dumont and the Butzbachs wherein G & P ''agreed to furnish to said defendants labor and materials for the installation of electrical wiring, circuits, and fixtures in the home of defendants Harry L. Butzbach and Roberta S. Butzbach, which was then being constructed by defendant Dumont Construction Co.,'' for which the defendants agreed to pay the sum of $256.55; that G & P performed said agree-

ment; and that only the sum of $200 has been paid on the agreed price, leaving a balance due G & P of $56.55. The third cause of action alleged that the Butzbachs and G & P also entered into three further written agreements dated October 4th, 15th and 17, 1956, respectively, whereunder G & P installed additional wiring for which the agreed price was $782.60. It was further alleged and not denied, that none of this amount had been paid to G & P. The second and third causes of action were based upon the four work orders for extras.

By their answer the Butzbachs denied any indebtedness to G & P and affirmatively alleged that G & P and Dumont entered into certain agreements, both oral and written, to defraud the Butzbachs by installing certain electrical work contrary to the specifications and that any claim G & P may have against them is void as contrary to the public policy of the state as set forth in section 7109 of the Business and Professions Code. By an amendment to their answer the Butzbachs set up a counterclaim in which they alleged that between July 23, 1956, and September 13, 1957, G & P agreed with Dumont and the Butzbachs to do the electrical work in their home; that the work was agreed to be done in accordance with the plans and specifications; that the work was not done in accordance with the plans and specifications in that the materials used were different from and inferior to those called for in the plans and specifications and in that some items of work were omitted; and that by reason of said deviations and said omissions the Butzbachs had been damaged in the amount of $5,800.

The Butzbachs alleged in their cross-complaint that G & P's predecessor and Dumont "entered into agreements, both written and oral . . . to install and have installed said electrical work contrary to the said plans and specifications, each well knowing that this was without the consent or knowledge of these cross-complainants"; that pursuant to these agreements certain electrical work was installed contrary to the plans and specifications; "this departure . . . being without the consent or knowledge of these cross-complainants, except that cross-complainants did during the course of construction consent to have the residence wired without a touch-plate or low voltage system as required by the specifications. Said consent of these cross-complainants being obtained by the refusal of said Robert Powell and Edward Gill (G & P) to comply with

said specifications unless these cross-complainants paid a further sum to them for so doing." It is further alleged that "before, during or after the construction" G & P Electric Company, Inc., was incorporated and became a party to the conspiracy as soon as it came into existence. The cross-complaint concludes with an allegation of damages by reason of the conspiracy in the amount of $6,000.

The answers of G & P and Dumont to the Butzbachs' cross-complaint deny any conspiracy and any departure from plans and specifications and also that the Butzbachs sustained any damage. Dumont's answer further sets up that on September 23, 1957, the Butzbachs and Dumont each executed and delivered to the other a mutual release wherein the Butzbachs accepted the dwelling "as is" and agreed to "make no further claims of any nature whatsoever pursuant to said original contract or any modification, amendment or change thereof, whether by written or oral agreement or otherwise."

In his opening statement to the trial court, counsel for G & P indicated that G & P could not make out a case for foreclosure or a mechanic's lien because the lien was not timely filed but that he expected to prove the reasonable value of material and labor furnished. Butzbachs' motion for nonsuit was denied. After G & P rested, its motion to amend the complaint to allege an express contract was granted. Another motion for nonsuit was denied.

Judgment was rendered in part as follows:

". . . plaintiff (i.e., G & P) have and recover from defendants Dumont Construction Co., Pete Dumont, James Howard, Harry L. Butzbach and Roberta S. Butzbach, jointly and severally, the sum of $56.55; that plaintiff have and recover from defendants Dumont Construction Co., Pete Dumont and James Howard the further sum of $452.40; and that plaintiff have and recover from defendants Harry L. Butzbach and Roberta S. Butzbach the further sum of $872.02.

"It Is Further Adjudged that defendants Harry L. Butzbach and Roberta S. Butzbach take nothing by reason of their counterclaim; that cross-complainants Harry L. Butzbach and Roberta S. Butzbach take nothing by reason of their cross-complaint; and that plaintiff have its costs herein incurred amounting to $52.60."

The Butzbachs filed their notice of appeal "from the judgment . . . in favor of the plaintiff and cross-defendants in said action, and against said defendants and cross-complainants; and from the whole thereof."

Insofar as material to this appeal, the trial court found that on July 16, 1956, Gill and Powell (G & P's predecessor partnership) entered into a written subcontract with Dumont for the electrical work of the Butzbachs' residence for the contract price of $2,262; that on March 18, 1957, G & P was formed and Gill and Powell assigned all of their interest in the contract to G & P; that G & P and its predecessor *substantially performed* all of the terms and conditions on their part to be performed under said contract *with the sole exception that they did not provide switches for the convenience outlets as required and that soffit lights of 100-watt capacity were installed in lieu of lights of 150-watt capacity as specified;* that after the Butzbachs took possession and moved into the house, more particularly on September 23, 1957, the Butzbachs executed and delivered to Dumont a release of all claims arising out of the performance of the building contract and Dumont's performance thereof; that there remains due to G & P from Dumont the sum of $452.40; that all of the allegations of G & P's second and third causes of action respecting its contracts with the Butzbachs for work referred to as extras are true; (note: As to the second and third causes of action, the trial court found that G & P's assignors "performed all of the terms and conditions on their part to be performed under said contract . . ."); and that the allegations in the Butzbachs' third affirmative defense to the effect that G & P and Dumont entered into an agreement to perform the work in a manner contrary to the specifications are untrue.

With respect to the cross-complaint, the court found the following to be false: the allegation that G & P and Dumont entered into an agreement to do the electrical work contrary to the plans and specifications; the allegation that the agreement between the parties was made without the knowledge of the Butzbachs; and the allegation that the Butzbachs had been damaged. At the same time, the court found all of the allegations contained in G & P's and Dumont's answer to the cross-complaint to be true.

The Butzbachs first contention is that the trial court erred in finding that G & P substantially performed (with two exceptions) its subcontract with Dumont.

This finding relates only to G & P's performance under its original subcontract with Dumont and does not concern the sufficiency of G & P's performance of the agreements for extras which were the subject matter of G & P's second and

third causes of action and which the court found were fully performed.

The rule relating to the doctrine of substantial performance in building construction cases is set forth in the leading case of *Thomas Haverty Co.* v. *Jones,* 185 Cal. 285, wherein the court states at pages 288-289 [197 P. 105]:

"The general rule on the subject of performance is that 'Where a person agrees to do a thing for another for a specified sum of money to be paid on full performance, he is not entitled to any part of the sum until he has himself done the thing he agreed to do, unless full performance has been excused, prevented or delayed by the act of the other party, or by operation of law, or by the act of God or the public enemy.' [Citation.] This, of course, refers to actions upon the contract for the contract price. The right to sue on an implied contract for the value of a partial performance is a different question and is not here involved. The rule just stated is that prevailing at common law. It has now been greatly relaxed and it is settled, especially in the case of building contracts where the owner has taken possession of the building and is enjoying the fruits of the contractor's work in the performance of the contract, that if there has been substantial performance thereof by the contractor in good faith, where the failure to make full performance can be compensated in damages to be deducted from the price or allowed as a counterclaim, and the omissions and deviations were not willful or fraudulent and do not substantially affect the usefulness of the building for the purposes for which it was intended, the contractor may, in an action upon the contract, recover the amount unpaid of his contract price, less the amount allowed as damages for the failure in strict performance. [Citations.]"

The Butzbachs have no status to complain of the judgment insofar as it is based upon G & P's claim for compensation under its *subcontract* with Dumont. The Butzbachs were not parties to the subcontract. The "GENERAL CONDITIONS OF THE CONTRACT FOR THE CONSTRUCTION OF BUILDINGS" (i.e., standard A.I.A. form) was, with certain exceptions not here pertinent, expressly made a part of the original contract between the Butzbachs and Dumont and also the subcontract between G & P and Dumont. Article 36 of said general conditions provides in pertinent part as follows:

"Art. 36. Subcontracts.

"The Contractor [i.e. Dumont] agrees that he is as fully responsible to the Owner for the acts and omissions of his subcontractors and of persons either directly or indirectly employed by them, as he is for the acts and omissions of persons directly employed by him.

"*Nothing contained in the contract documents shall create any contractual relation between any subcontractor and the Owner.*" (Emphasis added.)

G & P (subcontractor) and Dumont (contractor) were the only parties to the subcontract. On G & P's first cause of action (action on the subcontract) judgment was in favor of G & P and against Dumont. The judgment was favorable to the Butzbachs since G & P did not obtain a lien upon their property. Dumont concedes that G & P's performance was satisfactory.

The fact that there was substitution of materials does not negative the determination of substantial performance. Substitution of material was permissible under the provisions of the specifications which provided in part: "Should it become necessary for a substitution of Electrical material, the quality supplied will be comparative to that called for in specifications."

As indicated above, the court found substantial performance of the subcontract "with the sole exception that they did not provide switches for the convenience outlets as required and that soffit lights of 100 watt capacity were installed in lieu of lights of 150 watt capacity as specified and required in said contract between the defendant Dumont . . . and the defendants Harry L. Butzbach and Roberta S. Butzbach."

With regard to the soffit fixtures, the evidence indicates that the Butzbachs consented to the use of the 100-watt size in lieu of the 150-watt size.

Concerning the omission to install switches for the convenience outlets, the evidence supports the determination that the Butzbachs were at fault in not informing G & P where the switches were to be located prior to the time the work had progressed beyond the point that it was practicable to install them.

Finally, on September 23, 1957, subsequent to the occupancy of the premises by the Butzbachs and prior to G & P's filing the action, the Butzbachs and Dumont executed a "Mutual Release." This release provides in pertinent part

that the Butzbachs "accept said premises as is as of this date and make no further claims of any nature whatsoever pursuant to said original contract . . ." As stated in 9 Cal.Jur. 2d., Building Contracts, section 12, page 295: ". . . The acceptance of a building, in the absence of fraud or mistake, implies a waiver of *any claim* for damages on account of nonperformance in any particular." (Emphasis added.)

Having released the general contractor from all claims for deficient performance of his contract, the Butzbachs cannot now be heard to complain against G & P about the electrical work it performed for Dumont under its subcontract with Dumont.

The Butzbachs next contend that the trial court erred with respect to their counterclaim. As indicated, the trial court found G & P substantially performed its subcontract with Dumont except as to the two items discussed above (i.e., soffit lights and switches for convenience outlets).

Apparently, the Butzbachs' position is that the trial court should have allowed an offset for G & P's deficient performance under its subcontract with Dumont against G & P's claim for the extras.

The Butzbachs are not entitled to an offset against G & P as to these items for the same reasons hereinabove noted that they are precluded from attacking the sufficiency of G & P's performance of its subcontract with Dumont. However, the Butzbachs raise two additional bases for asserting their right to offset. It is contended that even though the Butzbachs were not parties to the G & P-Dumont subcontract, nevertheless they are third party beneficiaries of said subcontract and also that they acquired certain rights by virtue of section 7109 of the Business and Professions Code.

A third party beneficiary of a contract may maintain an action directly on said contract. (Civ. Code, § 1559.) The promise by the promisor is treated as having been made directly to the third party beneficiary. (*J. F. Hall-Martin Co.* v. *Hughes,* 18 Cal.App. 513 [123 P. 617].) Not every person who secures a benefit from a contract is entitled to maintain an action. An incidental beneficiary cannot maintain an action. (See 12 Cal.Jur.2d § 268, p. 500.) Whether a beneficiary is a beneficiary for whose express benefit the contract was entered into, or is merely an incidental beneficiary, is a question of construction. (*Shell* v. *Schmidt,* 126 Cal.App.2d 279 [272 P.2d 82]; *Woodhead Lumber Co.* v. *E. G. Niemann Investments,* 99 Cal.App. 456 [278 P. 913].)

■ While the Butzbachs would receive the benefit of having the electrical work performed by virtue of G & P performing its subcontract with Dumont, this factor alone would not make the G & P-Dumont subcontract a contract for the express benefit of the Butzbachs.

The provision in the prime contract between the Butzbachs and Dumont that "nothing contained in the contract documents shall create any contractual relation between any subcontractor and the Owner," was also made a part of the G & P-Dumont subcontract.

■ However, even if it be assumed that the Butzbachs were third party beneficiaries of the G & P-Dumont subcontract, satisfaction of the obligation by either the promisor (G & P) or the promisee (Dumont) operates as satisfaction of the liability of the other. (See *Anderson* v. *Calaveras Cent. Min. Corp.*, 13 Cal.App.2d 338 [57 P.2d 560] ; Rest., Contracts, § 141; 6 Hastings L. J. 369.)

By virtue of the mutual release of September 23, 1957, the Butzbachs "accept said premises as is as of this date and make no further claims of any nature whatsoever pursuant to said original contract . . ." Having accepted performance of the contract by the general contractor (said performance naturally including the electrical phases of the contract), the obligation owed them has been satisfied.

■ Insofar as the Butzbachs' contention that they acquired "Statutory rights conferred by Section 7109 of the Business and Professional [*sic*] Code," we think this is devoid of merit.

Section 7109 of the Business and Professions Code sets forth one of the grounds for suspension or revocation of a license. This section provides:

"Wilful departure from or disregard of, plans or specifications in any material respect, and prejudicial to another without consent of the owner or his duly authorized representative, and without the consent of the person entitled to have the particular construction project or operation completed in accordance with such plans and specifications constitutes a cause for disciplinary action."

■ As stated in *Howard* v. *State*, 85 Cal.App.2d 361, 365-366 [193 P.2d 11] :

". . . The purpose of the act [licensing act] is to guard the public against the consequences of incompetent workmanship, imposition and deception. In order to procure a license an

applicant is required to make a showing of good character and of a degree of experience and general knowledge of the building, health, safety and lien laws of this state, and of the rudimentary administrative principles of the contracting business, as the board deems necessary for the safety and protection of the public. (§§ 7068, 7069.) Willful breaches of contract and other willful and fraudulent acts, causing material injury to another, furnish grounds for suspension or revocation of a license. (§§ 7109-7119.) . . .

". . . The statute in question expresses the judgment of the Legislature that the prospect of having to pay damages for incompetence, fraud and breach of contract, is not an adequate deterrent from wrongful practices in the building trades. . . ."

We do not believe that section 7109 creates additional substantive rights in favor of the Butzbachs. That section is concerned only with defining a ground for disciplinary action by the State Contractors' License Board. In any event, the evidence does not establish a violation of this section.

The Butzbachs' next contention deals with purported errors relating to their cross-complaint. By their cross-complaint they sought damages against G & P and Dumont et al., for an alleged "Conspiracy to Defraud."

For purposes of clarity, a digest of the various pleadings and pertinent findings are set forth in footnote 1.[1]

Dumont filed an "AMENDMENT TO ANSWER TO CROSS-COMPLAINT" wherein Dumont set forth the mutual release of September 23, 1957.

The trial court found (Finding XVI) that the "denials and

| [1]BUTZBACHS' CROSS-COMPLAINT | G & P'S ANSWER | DUMONT'S ANSWER |
|---|---|---|
| Paragraph I: | | |
| a) Butzbachs entered into written contract with Dumont whereby Dumont agreed to build a residence for the Butzbachs. | a) Admit Butzbachs engaged to build residence. | a) Admits. |
| b) Dumont agreed to build the residence according to certain plans and specifications which were signed by the parties and made part of the contract. | b) Deny remaining allegations. | b) Denies Dumont signed plans and specifications. |

TRIAL COURT FOUND (Finding XII) THAT PARAGRAPH I OF SAID CROSS-COMPLAINT IS TRUE. [*Footnote 1—Continued on following pages.*]

allegations in the answer of cross-defendants Dumont Construction Company, Pete Dumont and James P. Howard, Jr., and of the amendments thereto are true.''

The Butzbachs assert that the trial court erred in

| BUTZBACHS' CROSS-COMPLAINT | G & P'S ANSWER | DUMONT'S ANSWER |
|---|---|---|
| **Paragraph II:** | | |
| a) G & P was supplied copy of plans and specifications by Dumont for purposes of making bid to do electrical work under said contract. | a) Expressly admits. | a) Admits. |
| b) G & P ''submitted a bid to ... Dumont ... to install the electrical work ... contrary to the requirements of the plans and specifications.'' | b) Expressly admits. | b) ''... [S]pecifically deny that the bid submitted by ... (G & P) was contrary to the plans and specifications. |
| c) The bid was accepted by Dumont without the knowledge of the Butzbachs. | c) Deny. | c) ''... [S]pecifically deny that the acceptance of the bid by Dumont ... was done without the knowledge of the Butzbachs.'' |

TRIAL COURT FOUND (Finding XII) THAT PARAGRAPH II OF THE CROSS-COMPLAINT IS TRUE ''with the exception of the allegation that ... (G & P) submitted a bid to perform the work therein referred to contrary to the requirements of the plans and specifications, which allegation [i.e., subdivision ''b''] is false.''

| BUTZBACHS' CROSS-COMPLAINT | G & P'S ANSWER | DUMONT'S ANSWER |
|---|---|---|
| **Paragraph III:** | | |
| a) ''... Dumont ... and ... (G & P) entered into agreements both written and oral with each other to install and have installed said electrical work contrary to the said plans and specifications each well knowing that this was without the consent or knowledge of the Butzbachs.'' | a) ''... admit that a written agreement was entered into between ... Dumont ... and (G & P) for the installation of the electrical work ...'' | a) ''... admit that Dumont ... and (G & P) entered into agreement for the installation of the electrical work and that it was installed on the premises ...'' |
| | b) Deny remaining allegations. | b) Deny remaining allegations. |

TRIAL COURT FOUND (Finding XIII) THAT PARAGRAPH III OF THE CROSS-COMPLAINT WAS UNTRUE.

finding that G & P did not submit a bid which was contrary to the plans and specifications. (See footnote 1, paragraph II b and Finding XII.)

Insofar as G & P is concerned, it is clear that G & P expressly admitted in their answer that they submitted a bid to Dumont to install the electrical work contrary to the requirements of the plans and specifications.

The evidence shows that G & P submitted two bids. One of the bids stated "As per plans and specifications with the following exceptions. Wiring to be conventential [*sic*] wiring (i.e. without touch-plate or low-voltage system)."

Testimony was received to the effect that G & P interpreted

| BUTZBACHS' CROSS-COMPLAINT | G & P'S ANSWER | DUMONT'S ANSWER |
|---|---|---|
| Paragraph IV: a) "... (G & P) did install certain electrical work ... contrary to the plans and specifications." | a) Admit. | a) Admit that G & P installed certain electrical work. |
| b) The departure from the plans and specifications was "without the consent or knowledge of ... (the Butzbachs), except that ... (the Butzbachs) did during the course of construction consent to have the residence wired without a touch-plate or low-voltage system as required by the specifications." | b) Deny. | b) Denied all other allegations. |
| c) "Said consent ... being obtained by the refusal of ... (G & P) to comply with said specifications unless ... (the Butzbachs) paid a further sum to them for so doing." Also that certain misrepresentations were made that items were not manufactured by companies mentioned in the specifications." | c) Deny. | |

TRIAL COURT FOUND (Finding XIV) THAT PARAGRAPH IV IS UNTRUE EXCEPT "the allegation that cross-complainants consented, during the course of construction, to the wiring of the residence without a touch-plate or low-voltage system, which allegation is true."

the plans and specifications as not calling for a touch-plate system in the interior of the house. Thus, whether the plans and specifications are viewed as calling for a touch-plate system or for conventional wiring, one of the two bids submitted by G & P had to be at variance with the plans and specifications.

The rule relating to admissions in pleadings is set forth in *Welch* v. *Alcott*, 185 Cal. 731 [198 P. 626]. It is therein stated at page 754:

" 'Every material allegation of the complaint, not controverted by the answer, must, for the purposes of the action, be taken as true . . .' (Code Civ. Proc., § 462.) It was said in *Burnett* v. *Stearns*, 33 Cal. 468 : 'The finding should be confined to the facts in issue. The province of the court in respect to facts is to determine but not to raise the issue.' (See also *Ortega* v. *Cordero*, 88 Cal. 221 [26 P. 80].) 'Where a complaint in an action contains an allegation of fact which is distinctly and unqualifiedly admitted by the answer, there is no issue as to the fact. The allegation of fact being admitted it is conclusive. A finding against the

| BUTZBACHS' CROSS-COMPLAINT | G & P'S ANSWER | DUMONT'S ANSWER |
| --- | --- | --- |
| Paragraph V: a) ". . . [A]t some time before, during or after the construction of said premises" G & P corporation was formed. | a) Admit. | a) Denial of each and every allegation contained in Paragraph V. |
| b) ". . . [T]his corporation became a party to the conspiracy as soon as it came into existence." | b) Denial that G & P corporation "at any time became a party to any conspiracy as alleged in said cross-complaint or otherwise or at all." | |

TRIAL COURT FOUND (Finding XV) THAT PARAGRAPH V WAS UNTRUE.

| Paragraph VI: a) By reason of the conspiracy to install work "contrary to said plans and specifications and by reason of said installation in accordance with said conspiracy" the Butzbachs were damaged in the sum of $9,338.75. | a) Denial. | a) Denial. |
| --- | --- | --- |

TRIAL COURT FOUND (Finding XV) THAT PARAGRAPH VI WAS UNTRUE.

admission is therefore outside the issues.' (*White* v. *Douglass,* 71 Cal. 115, 119 [11 P. 860].) It was declared in *In the Matter of the Estate of Doyle,* 73 Cal. 564, 570 [15 P. 125, 128]: 'When a trial is had by the Court without a jury, a fact admitted by the pleadings should be treated as "found." . . . If the court does find adversely to the admission, such finding should be disregarded in determining the question whether the proper conclusion of law was drawn from the facts found and admitted by the pleadings. . . . In such case the facts alleged must be assumed to exist. Any finding adverse to the admitted facts drops from the record, and any legal conclusion which is not upheld by the admitted facts is erroneous.' " (See *Julien* v. *Gossner,* 103 Cal.App.2d 338, 343 [229 P.2d 786]; *Horney* v. *Horney,* 118 Cal.App.2d 679, 683 [258 P.2d 555]: "Inasmuch as all allegations of fact which are admitted are conclusive, any finding adverse to the admission must be disregarded"; *Lifton* v. *Harshman,* 80 Cal.App.2d 422, 431-432 [182 P.2d 222]: "When allegations in a complaint are admitted by the answer (a) no evidence need be offered in their support; (b) evidence is not admissible to prove their untruth; (c) no finding thereon is necessary; (d) a finding contrary thereto is error.")

It is clear that the error is not prejudicial. The trial court found, upon substantial evidence, that the Butzbachs consented to the use of conventional wiring in lieu of a touch-plate system. (Footnote 1, Finding XIV.)

The above discussion is also dispositive of the Butzbachs' contention that the trial court erred when it found that G & P did not install electrical work contrary to the plans and specifications. (Footnote 1, paragraph IV a, Finding XIV.)

The submission of a bid by G & P which varied the terms of the plans and specifications certainly would not support a conclusion that G & P and Dumont conspired to injure the Butzbachs. The trial court found, upon substantial evidence, that there was no conspiracy and that the Butzbachs sustained no damages.

The next assertion is that the trial court erred when it found that a contract existed between the Butzbachs and G & P. This contract is concerned with the extras (i.e., G & P's second and third causes of action). The trial court found full performance by G & P.

The contracts for extras consist of plaintiff's (G & P's) Exhibits Numbers 3, 4, 5 and 6. As to the first of these, Mr. Powell testified that he was approached by Mrs. Butzbach with

an inquiry as to what the cost of the additional wiring would be; that in response thereto he prepared the estimate in the form of Exhibit Number 3; that he thereafter presented the estimate to Dumont and Mrs. Butzbach and that both signed it in his presence; and that he thereupon installed the wiring as outlined in the estimate. Later, during the trial, he testified that Dumont instructed him to deal directly with Mrs. Butzbach for any future extras which she might request, and that this was done; and that his agreement with Mrs. Butzbach regarding the extras was that "he was to install them and she was to pay for them." In each instance, after receipt of the signed document, G & P performed the work outlined therein.

Mrs. Butzbach admitted in her testimony that Dumont had instructed her to "obtain prices for electrical extras directly from Powell [i.e. G & P]."

The agreements represented by Exhibits Numbers 4, 5 and 6 were signed only by Mrs. Butzbach, as the result of direct dealings between her and G & P, and they appear never to have been referred to Dumont for approval or for any other purpose.

Finally, the Butzbachs affirmatively allege that they entered into agreements with G & P to install the electrical work in the project.

The remaining contentions of the Butzbachs have either already been disposed of or are without merit.

For the reasons stated, the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.