[Civ. No. 22563. First Dist., Div. One. Jan. 27, 1966.]

CONDERBACK, INCORPORATED, Plaintiff and Respondent, v. STANDARD OIL COMPANY OF CALIFORNIA, Defendant and Appellant.

Pillsbury, Madison & Sutro, Francis R. Kirkham, Thomas E. Haven and Anthony P. Brown for Defendant and Appellant.

FitzSimmons & Petris, Edward R. FitzSimmons and Roderic Duncan for Plaintiff and Respondent.

SULLIVAN, P. J.—Defendant Standard Oil Company of California (Standard) appeals from a judgment entered upon a jury verdict in favor of plaintiff Conderback, Incorporated (Conderback) in the sum of $154,374.45 with interest and costs.

The action was brought to recover the balance allegedly due on a contract for the construction, designing, maintenance and dismantling of Standard's exhibit at the Seattle World's Fair in 1962. There were two jury trials. On defendant's motion, the cause first proceeded to trial on the issues raised by the separate defenses of account stated, accord and satisfaction and compromise and release set forth

in defendant's answer and in the cross-complaint. (Code Civ. Proc., § 597.) By their negative answers to two special interrogatories submitted to them,[1] the jury in substance found that the parties had not agreed between themselves at either of the times therein specified as to what was the total amount then due Conderback. The cause then proceeded to a second trial before a different jury on the main issue dealing with the terms of the agreement entered into by the parties. The jury returned a verdict in favor of Conderback in the amount indicated above. This appeal followed.

At all times here material, Conderback was a California corporation engaged in the business of building advertising exhibits.[2] It had been organized in 1957 and had its principal place of business in San Francisco. All of its capital stock was owned by Marinus van der Woert and Edward Railsback, its president and vice-president respectively. Prior to the formation of Conderback, Railsback had been continuously employed in the exhibit business since 1935 and had personally done work for Standard since 1939. Van der Woert had worked in the exhibit display business since 1946 and during that time on exhibits for Standard. Both men had been employees together in the same exhibit building firm and were able to acquire some of the accounts, including that of Standard, when the firm ceased doing business.

From the time they organized Conderback, Railsback and van der Woert had continuous business dealings with the advertising department of Standard, approximately 90 percent of the time with either M. A. Mattes, the advertising manager, or Jeff Kersh, an employee in the department. From 1960 until it suspended its operations, Conderback did over 300 jobs for Standard's advertising department. Among these were Standard's exhibits at the California State Fair, which Conderback built each year. Railsback considered Standard to be one of Conderback's better accounts. However, prior to the Seattle World's Fair job, the largest job

[1]The special interrogatories were: ''1. Did the parties agree between themselves in July or August of 1962 as to the total amount due Conderback, Inc. for the erection of the building and the construction and installation of displays in the building at the Seattle World's Fair; 2. Did the parties agree between themselves in January, 1963, as to all sums due Conderback for all work done by Conderback, Inc. for Standard Oil at the Seattle World's Fair.''

[2]Conderback suspended business activities in July 1963, approximately two months after the commencement of this action on May 13, 1963. It was not a going business at the time of trial.

done by Conderback for Standard was at the Portland Centennial involving an expenditure of about $40,000. The Seattle job was 10 times larger than any job Conderback had done for anyone.

In their years of working together on more than 300 jobs, there had never been any litigation between Conderback and Standard over the former's billings. According to their customary way of working together, Conderback would "be notified that there was a job coming up and we had a certain budget to adhere to. We would then come back to the shop and design within this budget and endeavor to hold the budget price that they had given us." An estimate would be given through the use of a basic formula but at the end of the job an adjustment would usually be made based on the same formula to take care of changes and additions.[3] This applied to so-called "time and material" business as distinguished from "bid" business which was billed at the bid price. There was testimony that Conderback's methods of estimating and billing were discussed with Standard and that the latter was well aware of them. The increase of the markup on subcontracted work (see fn. 3, *ante*) had also been discussed with Standard who had assured Conderback that this so-called agency markup should and could be used.

The Seattle World's Fair was scheduled to open on April 21, 1962. In the spring of 1961, Railsback and van der Woert met with Mattes, advertising manager of Standard, to discuss the possibility of having Conderback handle Standard's exhibit at the Fair. Mattes inquired as to whether the project was beyond the "scope" of Conderback and was assured by the latter's representatives that they could handle the job since much of the work would be subcontracted. Mattes was told that because Conderback was a small company and the project was a large one, Conderback would have to bill Standard in advance of any expenditures. Mattes selected Conderback to do the job. There were no other competitive bidders.

---

[3] In general outline, Conderback's standard formula which it had used over the years consisted of the following principal factors: (a) the cost of labor plus a 100 percent markup plus an additional markup for fringe benefits; (b) the cost of materials plus a 50 percent markup; (c) the cost of subcontracted work plus a 10 percent markup "as a rule," subsequently changed to 17.625 percent as an "agency markup" customarily paid agencies by Standard when they supervised subcontractors.

During these preliminary discussions Mattes advised Conderback that his department had authority for a budget of $230,000 for the project "plus a 10 per cent discretionary factor."[4] On July 6, 1961, Conderback wrote to Mattes: "Confirming our discussions . . . we believe the exhibit as presented, including tentative individual displays, can be constructed, with minor modifications, for the $230,000.00 budget plus the 10% override."[5] This letter was signed by both van der Woert and Railsback and underneath said signatures contained the language "ACCEPTED BY Standard Oil Company of California" with space provided for signature and date. Mattes acknowledged acceptance on the same date. Railsback testified that the letter-contract of July 6, 1961, was entered into on the basis of the budgeted amount. The next day, July 7, 1961, Standard, through Mattes, issued its purchase order to Conderback for "Century 21 Exhibit—Seattle," covering exhibit building and displays, but silent as to any specified price.[6] At this time there were no plans in existence.

Conderback started work almost immediately. To design Standard's building at the Fair, it retained one Tepper who was to work directly with Railsback and van der Woert, but who soon "bypassed" them at Mattes' request and worked with the latter who approved the building and all exhibits before Conderback saw them. Conderback also retained an architect and an engineer and entered into a number of subcontracts for the performance of the construction work. The subcontractors billed Conderback for the work done and the latter in turn eventually billed Standard for the same

[4]This followed a letter of June 15, 1961, from Conderback to Mattes offering an "estimated quotation for budgeting purposes only" of $275,194.

[5]The letter further stated that "any major changes from building model or additional mechanical displays, we are sure you will understand, will be confirmed in writing and subject to negotiation" and presented a plan for payment consisting of "a blanket advance progress billing substantiated within 30 days" to be made on the first of each month, payment thereon on the 10th of the month, and "detailed billing for the payment . . . by the end of the month." There is testimony that these arrangements were made because Conderback did not have "the cash load to finance this job."

[6]This purchase order is attached to and incorporated by reference in plaintiff's amended complaint which alleges the delivery thereof on July 7, 1961, defendant's promise to pay for labor, material and expenses, plus amounts for overhead and profit, and the delivery on August 10, 1961, of a modification (request for adjustment) of such order. Plaintiff's amended complaint is based solely upon such purchase order and modification.

amounts plus a markup for the supervision of the work involved.

The concept of the Century 21 Exhibit as designed within the limits of the initial budget of $230,000 soon started changing and continued to change up to and even after the Fair opened in April 1962. These changes were made principally by Mattes. At first Conderback did not challenge his decisions but finally at the beginning of 1962 the matter "was so far out of hand that . . . [Conderback] could never catch up," since it had no control of the budget or the design or the coordination between them. When Railsback raised some question about completing on time the work as modified, Mattes replied "Let's get the job done, we will worry about that later."

At about this time—February 1962—the parties realized that the job had already cost more than the initial budget figure of $230,000. Standard thereupon requested from Conderback a written estimate of the total cost of the job. According to Standard's Whitmore, this was required for budgetary reasons. In compliance with the request, Conderback wrote to Standard on February 12, 1962, giving an itemized breakdown of costs and noting that to date there were total authorized expenditures of $307,518.12.[7] Standard then requested a firm bid on the amount required to finish the job. In reply Conderback on February 26, 1962, sent Standard "our firm bid" for the Century 21 Exhibit in the sum of $351,587.20 based on the detailed breakdown furnished in its letter of February 12, 1962.[8] Standard accepted and confirmed this "firm bid" by its letter of March 23, 1962.[9]

---

[7]The letter stated in part: "At the inception of this project, we offered our original estimate to you for $275,000.00. This was subsequently formalized in writing for $253,000.00 and we undertook the project. Since starting the project there has been a series of changes and additions to the project. To date we have written and verbal approval for the following changes and additions" in the amount of $307,518.12 including "Formal estimate" of $253,000 (apparently $230,000 plus the 10 percent override). It concluded: "The changes and additions listed on the above and preceding pages have materially increased our original estimate to you for the entire exhibit. It is hoped that these changes and additions *can be negotiated and approved* as soon as possible so that our delivery date will not be impaired." (Italics added.)

[8]The letter concluded: "The price is based on designs and details *as planned as of* February 12, 1962. Any *major changes or additions* requested to the project *will be negotiated* and *confirmed to you in writing* before expense is incurred." (Italics added.)

[9]This is made the basis of Standard's first affirmative defense and of all four counts of its cross-complaint.

The Fair exhibit opened on time. During the next two months, Standard made several requests for a final billing. On June 15, 1962, Conderback's van der Woert wrote Mattes attaching "our breakdown sheets covering expenses incurred by our Company to June 1, 1962." Explaining "over-budget expenditures,"[10] Conderback requested an opportunity to meet with Mattes and "to negotiate the outcome of these expenditures." "Actual costs as of 6-1-62" were scheduled at *$520,134.17* of which $344,465.31 was noted as "paid." Conderback requested payment "at this time" of $137,405.49, which did not include balance of maintenance costs, dismantling costs or State of Washington sales tax.

There ensued a number of meetings between the representatives of the parties. In the meantime Conderback was receiving invoices after June 1—the cutoff date of their June 15 billing. Standard indicated that it was not willing to discuss these latter invoices at the time. On June 30, 1962, Conderback's van der Woert wrote to Mattes attaching "schedules covering costs . . . to June 1, 1962, maintenance costs for the exhibit to October 26, 1962, and costs incurred during the month of June" but holding in abeyance design fees and sales tax. Total actual costs to June 1, 1962, were therein scheduled at $525,134.17, of which the same amount was noted paid as in the June 15 schedule and $109,762.23 was the "additional requested." The parties agreed upon a number of the items for which Conderback thereupon invoiced Standard on July 11, 1962, in the sum of $66,794.01 and was paid. On July 26, 1962, Conderback again invoiced Standard for specified items totalling $39,848.87.[11] The invoice was not designated a final billing. Eventually Standard agreed to pay the invoice. Standard's Whitmore testified at the first trial that he wanted a reassurance from Conderback that it was the final payment on the building and exhibits. Railsback on the other hand testified that he attended all the meetings, that he never heard of such a statement and that it was not a condition of the payment of either the July 11 or the July 26 invoice. Defendant's claim is that it specifically conditioned its agreement to pay the July 26 invoice on the receipt of an

[10]This was attributed to: (1) Conderback's inability to coordinate design with estimated budget; (2) numerous changes to exhibits, art and copy; (3) necessity of quoting in "our February 12, 1962 budget quotation" on many exhibits not then in final design concept.

[11]Attached schedules showed $418,759.32 as of July 16, 1962, plus the "Additional Requested" and invoiced of $39,848.87 producing a grand total of $458,608.19, of which $411,259.32 had been paid.

assurance from Conderback that this was the final billing and that such assurance was received in the form of Conderback's letter of August 2, 1962.[12] Standard paid the full amount of the July 26 invoice. There was no indication on the check that it was in final payment.

Nevertheless, after these events upon which Standard based its claim of final settlement, said defendant paid $1,871.80 to Conderback, most of which represented charges for work done prior to May 28, 1962. Additionally, on September 14, 1962, van der Woert wrote to Mattes "listing the developments to date regarding the following unpaid accounts."[13] Eventually in the fall of 1962, Conderback settled its obligations with the designer and its sales tax liability to the State of Washington. Although the parties differ as to the basic contract under which the work was being done, they appear to agree that under either of their respective theories, the total amount to be paid by Standard to Conderback could not be arrived at until the above two liabilities had been determined.

In December 1962, van der Woert telephoned Whitmore, advising that there were some additional bills.[14] On January

---

[12]This letter to Mattes from van der Woert was embraced within the first special interrogatory at the first trial (see fn. 1, *ante*). It read: "Regarding our invoice 21000-11, dated July 26, 1962, the amount will cover *final billing* for the erection of the building and construction and installation of the displays within the exhibit building. The amount *does not include* maintenance, dismantling, sales tax, additional design fees, nor additional changes to the exhibit since June 1, 1962." (Italics added.)

Andrew Leong, office manager and accountant for Conderback, gave the following explanation at the first trial as to how the letter came to be written: On August 2, 1962, Standard's Whitmore telephoned him and requested such a letter, even dictating the first sentence. Whitmore gave no indication that this was the agreement of the principals and at the time both Railsback and van der Woert were out of the office. Leong had the letter typed and placed on van der Woert's desk for signature. Van der Woert then signed the letter assuming that it referred to the finality of that particular billing.

[13]This letter referred to three subcontractors and Tepper, the designer. It concluded by stating that Conderback had never included the amounts from the first three to Standard "in our final billing. We feel that if the explanations are satisfactory, we will negotiate with them."

[14]According to Whitmore, whose testimony is relied upon by both parties on this point, van der Woert said there were a number of items previously understood not to be Standard's responsibility which van der Woert had not been able to negotiate with subcontractors in Seattle. He inquired whether Whitmore "would meet with him and discuss whether or not Standard would be willing to pick up some of these costs because he was going to be stuck with them, and I said yes, I would meet with him, . . ." After the meeting, Whitmore requested van der Woert to send a list of the items.

9, 1963, Conderback sent a list totalling $25,878.21, including the sales tax liability of $19,842.11 and thus representing additional items of $6,036.10.[15] Whitmore testified that he telephoned van der Woert and told him the items Standard would pay; that Conderback then sent an invoice therefor which Standard returned because it did not contain the words "final billing," and that on January 21, 1963, Conderback sent an acceptable invoice.[16] Standard paid the sum of $2,025.13.

By this time, Conderback's Leong, who had run an audit on the Fair job, had left the company. Railsback had been hospitalized with a serious illness until January 3, 1963, and the two Conderback officers had decided to defer discussion with Standard of the application "of our formula to the costs that we had incurred. . . ."[17] Railsback and van der Woert, with the help of an outside auditor, then started "to re-audit this job on a complete and thorough basis" in the latter part of January and the first part of February. In early March 1963, they contacted Mattes and asked for an opportunity to present their final bill. A meeting was held at which Conderback submitted and left with Standard for its examination all of the work sheets of the reaudit together with their supporting data. Other discussions followed with Standard's representatives. There was testimony that the manager of Standard's purchase and stores department indicated that after the $230,000 limit of the original purchase order had been passed, the job should have been handled on a cost-plus-*fixed-fee* basis. Conderback indicated it merely wanted its existing formula applied. At one point, Standard's representatives offered a 17.625 percent markup on

[15]The list not in the form of an invoice was captioned: "Standard Oil Company Final Billing Century 21 World's Fair."

[16]In the sum of $3,110.19 (later adjusted) and captioned "Re: Standard Oil Company of California final billing, Century 21, World's Fair."

[17]According to plaintiff's contentions made at the pretrial conference and plaintiff's evidence at trial, the sum to be paid plaintiff for the completion of the entire job was to be computed by the following formula: (1) the amount paid by plaintiff to its subcontractors plus a 17.625 percent markup for supervision; (2) plaintiff's own labor costs plus 100 percent markup, plus 19.8 percent of said labor costs to cover fringe benefits, plus an additional 10 percent on the total sum; (3) plaintiff's own cost of materials plus a markup of 50 percent; (4) miscellaneous direct expenditures, e.g., freight and telephone, plus a 10 percent markup; and (5) expenses of plaintiff's officers while in Seattle at $200 a day each (compare customary formula of plaintiff as outlined in fn. 3, *ante*). Railsback testified that by agreement between the parties, the above formula was to be applied to the contract entered into.

some of the overall costs of the job which would give Conderback an additional $7,000. Upon its refusal, Mattes telephoned Railsback and "offered a different formula that amounted to $28,000" which was also rejected. Conderback insisted that it wanted its existing formula, which, according to Railsback's testimony, "would have been in the vicinity of $664,000." Conderback then demanded payment of said sum less approximately $494,000 theretofore paid. The demand was rejected and the present action commenced.[18]

Standard's first attack is aimed at the very heart of the judgment. It contends that Conderback could not bring or maintain the present action since it was acting in the capacity of a contractor in California without being duly licensed.[19] In substance defendant argues that all negotiations and correspondence leading up to the contract between the parties, the contractual arrangements themselves and certain contracts between Conderback and the designer, architect and engineer of the project all took place in San Francisco, where the principals herein and the other persons mentioned all had their respective offices. At the same time Standard admits, as it must, that the building which was the subject of the project was intended to be, and in fact was, constructed outside of the State of California and in the State of Washington and has conceded both in its briefs and at oral argument that its contention is confined to and is predicated solely upon those acts of Conderback which occurred in the State of California.

Section 7028 of the Business and Professions Code[20] makes it *"unlawful* for any person to engage in the business or *act*

[18]On May 31, 1963, the amended complaint prayed for judgment in the sum of $171,026.80 ($665,400.85 less $494,374.05 paid).

[19]This issue was not raised by the pleadings or designated as an issue in dispute in the interlocutory pretrial conference order made before the first trial. At the start of the first trial it was asserted in a trial memorandum filed by defendant. It was thereafter raised in defendant's motion for a judgment notwithstanding the verdict (necessarily made after the second trial) upon denial of which the court stated: "It is my opinion and the Court finds that plaintiff did not have to possess a California Contractor's license for the performance of the work in the State of Washington; . . ." Although the issue was timely raised below, "It is immaterial that the parties, whether by inadvertence or consent, even at the trial do not raise the issue. The court may do so of its own motion when the testimony produces evidence of illegality. [Citation.] It is not too late to raise the issue on motion for new trial [citation], in a proceeding to enforce an arbitration award [citation], or even on appeal. [Citation.]" (*Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 148 [308 P.2d 713].)

[20]Hereafter unless otherwise indicated all section references are to the Business and Professions Code.

*in the capacity of a contractor within this State* without having a license therefor, . . ." (Italics added.) Section 7030 at all times material herein provided:[21] "Any person who *acts in the capacity of a contractor* without a license is guilty of a misdemeanor." (Italics added.) Section 7026 of said code defines contractor as follows: "The term contractor for the purposes of this chapter is synonymous with the term 'builder' and, within the meaning of this chapter, a contractor is any person, who *undertakes* to or offers to undertake to or purports to have the capacity to undertake to or submit a bid to, or does himself or by or through others, *construct,* . . . or *demolish* any *building,* . . . or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith. The term contractor includes subcontractor and specialty contractor." (Italics added.)

Section 7031 provides: "No person engaged in the business or *acting in the capacity of a contractor,* may bring or maintain any action in any court of this State for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging and proving that he was a duly licensed contractor at all times during the performance of such act or contract." (Italics added.)

Conderback concedes, and the record shows, that it was not a licensed contractor in California at any time. Its basic position is that the California Contractors' License Law (Bus. & Prof. Code, §§ 7000-7145) does not extend to construction outside of California although it has not squarely met defendant's argument that Conderback's acts within the state were done in the capacity of a contractor so as to make the law operative against it. Neither of the parties has cited, nor have we found, any case involving a similar question.

It is clear at the outset, as indeed defendant seems to concede, that where a state in the proper exercise of its police power enacts statutes, such as those now before us, regulating a business and requiring a license to be obtained by anyone engaged therein (*Riley* v. *Chambers* (1919) 181 Cal. 589, 592-593 [185 P. 855, 8 A.L.R. 418]; *Drummey* v. *State Board of Funeral Directors* (1939) 13 Cal.2d 75, 79 [87 P.2d 848]; *In re Fuller* (1940) 15 Cal.2d 425, 428-431 [102 P.2d 321];

---

[21]Section 7030 was repealed in 1963 and in substance incorporated within section 7028, which was amended at the same time.

*Rosenblatt* v. *California State Board of Pharmacy* (1945) 69 Cal.App.2d 69, 72-73 [158 P.2d 199]; *Doyle* v. *Board of Barber Examiner*s (1963) 219 Cal.App.2d 504, 509-510 [33 Cal. Rptr. 349]), the exercise of this regulatory power is necessarily limited to activities carried on within the territorial limits of such state. (See generally, 53 C.J.S., Licenses, § 6, pp. 464-469; 33 Am.Jur., Licenses, §§ 7-8, pp. 330-332.) Therefore it seems to us that the purpose of any given regulatory statute must be examined in the perspective of such constitutional principle.

In the much cited case of *Howard* v. *State of California* (1948) 85 Cal.App.2d 361, 365-366 [163 P.2d 11], it was said: "The purpose of the act is to guard the public against the consequences of incompetent workmanship, imposition and deception. In order to procure a license an applicant is required to make a showing of good character and of a degree of experience and general knowledge of the building, health, safety and lien laws of this state, and of the rudimentary administrative principles of the contracting business, as the board deems necessary for the safety and protection of the public. (§§ 7068, 7069.) Willful breaches of contract and other willful and fraudulent acts, causing material injury to another, furnish grounds for suspension or revocation of a license. (§§ 7109-7119.) . . . The statute in question expresses the judgment of the Legislature that the prospect of having to pay damages for incompetence, fraud and breach of contract, is not an adequate deterrent from wrongful practices in the building trades." Substantially the same views on the purpose of the Contractors' License Law have been expressed in other cases. (See *Loving & Evans* v. *Blick* (1949) 33 Cal.2d 603, 609 [204 P.2d 23]; *Franklin* v. *Nat C. Goldstone Agency* (1949) 33 Cal.2d 628, 632 [204 P.2d 37]; *Fraenkel* v. *Bank of America* (1953) 40 Cal.2d 845, 848 [256 P.2d 569]; *Bowline* v. *Gries* (1950) 97 Cal.App.2d 741, 743 [218 P.2d 806]; *Bierman* v. *Hagstrom Constr. Co.* (1959) 176 Cal.App.2d 771, 775 [1 Cal.Rptr. 826, 82 A.L.R. 1424]; *G & P Electric Co.* v. *Dumont Constr. Co.* (1961) 194 Cal.App. 2d 868, 879-880 [15 Cal.Rptr. 757]; *Steinbrenner* v. *J. A. Waterbury Constr. Co.* (1963) 212 Cal.App.2d 661, 666 [28 Cal.Rptr. 204].) In *Bowline, supra,* the court said: "The underlying purpose of the contractor's license law is to protect the general public respecting structural improvements to real property wherein special skill, training and ability are required." (97 Cal.App.2d 741, 743.) In *Fraenkel, supra,* it

was said: "That law was enacted for the safety and protection of the public against imposition by persons inexperienced in contracting work, and for the prevention of fraudulent acts by contractors resulting in loss to subcontractors, materialmen, employees, and owners of structures. [Citations.]" (40 Cal.2d at p. 848.) The same objective of promoting the "safety and protection of the public" by prohibiting inexperienced persons from engaging in contracting work had been emphasized by the Supreme Court in its previous decisions in *Gatti* v. *Highland Park Builders, Inc.* (1946) 27 Cal.2d 687, 690 [166 P.2d 265] and *Loving & Evans* v. *Blick, supra.*

Examined in the context of these cases, the concern for the public inherent in the statute centers upon building done in California and practices of the building trades in this state (*Howard* v. *State of California, supra,* 85 Cal.App.2d 361, 366); it focuses upon all those who may be involved in such building—subcontractors, materialmen, employees and owners (*Fraenkel* v. *Bank of America, supra,* 40 Cal.2d 845, 848); and it is thus the motivating influence in the policing of such work and practices for the protection of all concerned. Thus, as the above authorities point out, the law requires that an applicant for a contractor's license "show such degree of knowledge and experience in the classification applied for, and such general knowledge of the *building, safety, health and lien laws of the State* and of the administrative principles of the contracting business as the board deems necessary for the *safety and protection of the public*" (italics added; § 7068 as amended in 1963) and makes detailed provision for the investigation of the acts of contractors and for disciplinary proceedings in connection therewith. (§§ 7090-7124.1.) Among the causes and grounds for discipline (§§ 7107-7120) is the "Willful or deliberate disregard and violation of the *building laws of the state,* or of any political subdivision thereof, or of the *safety laws or labor laws or compensation insurance laws or Unemployment Insurance Code of the state,* or violation by any licensee of any provision of the *Health and Safety Code or Water Code, . . .*" (Italics added.) (§ 7110 as amended in 1965.)

In our view, it was not the purpose of the Legislature in enacting the Contractors' License Law to bring within its ambit a person who, not otherwise engaged in the contracting business in California, merely enters into negotiations or contracts in this state for a construction work or project in another state or foreign country. The purpose of the law is to

protect the public in California against incompetent and dishonest persons who do, or offer, undertake or contract to do, building in this state or represent that they have the capacity for such work in California. This objective of the law is insured by inspecting their building practices in this state and holding them accountable for a wilful disregard of California building and other laws. The above purpose and objective are not subserved by making subject to the license law those persons who do not contemplate any construction work in California but merely enter into negotiations and contracts here for construction work to be done outside the jurisdiction of California and beyond the reach of its building laws. By way of illustration, the legislative purpose would not be furthered in the instant case if we were to hold that a contractor duly licensed by the State of Washington would be required to have a California contractor's license before he could meet, negotiate and contract with Standard at the latter's offices in San Francisco for the construction of Standard's exhibit at the World's Fair in Seattle. We venture to say that many corporations of national and international size and scope of operations with executive and administrative offices located in this state negotiate and contract here for the construction of buildings and projects in other states and in foreign countries. It could not have been reasonably intended by the Legislature that all persons thus dealing with such corporations would be required to qualify for and obtain a California contractor's license. Nor could it have been reasonably intended that since they were subject to the Contractors' License Law, there was thereupon imposed upon the Contractors' State License Board (§§ 7000; 7011-7013; 7090-7098) the insuperable burden of investigating and passing upon the building practices of such persons all over the world. Basically, Conderback is in no different position.

We hold that where, as in the instant case, a person offers, undertakes or contracts in this state to construct or demolish a building, project or other improvement located outside of California, such person does not thereby become one engaged in the business or acting in the capacity of a contractor within this state so as to be subject to the Contractors' License Law. Nor does the mere fact that, as here, such person's principal place of business is in California necessarily compel a different conclusion.

Defendant refers us to *Lewis & Queen* v. *N. M. Ball Sons*

(1957) 48 Cal.2d 141 [308 P.2d 713], as authority for its proposition that the site of the actual construction work is immaterial since plaintiff did much of the administrative work for the Seattle project in San Francisco. But defendant takes the emphasized language of *Lewis & Queen* out of its context. That case involved physical work of construction *within* California and the point of the language relied upon by defendant was that in respect to such work it was intended by the Legislature that the partner-contractor who had charge of the administrative functions of the business should qualify under the law just as much as the partner-contractor who supervised the actual work of construction. There is nothing inconsistent between this holding and the conclusion we have reached herein.

Standard next contends that according to the undisputed evidence the parties after the completion of the job reached an agreement as to the amounts due Conderback which Standard promptly paid and that Conderback is bound by "the account stated by it and by the accord and satisfaction reached." It will be recalled that these and other special defenses were the subject of the first trial at which a jury returned a verdict rejecting them. It is now urged that there is no evidence supportive of such verdict and that this case is controlled by *Potter* v. *Pacific Coast Lumber Co.* (1951) 37 Cal.2d 592 [234 P.2d 16] and *Creighton* v. *Gregory* (1904) 142 Cal. 34 [75 P. 569]. Although Standard broadly states that all three of its special defenses are established on the record, it confines its argument and authorities to the defense of accord and satisfaction.

This defense is defined by Civil Code sections 1521 and 1523: "An accord is an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled." "Acceptance, by the creditor, of the consideration of an accord extinguishes the obligation, and is called satisfaction."

▪ The question whether an agreement amounts to an accord and satisfaction is one of the intention of the parties and is therefore a question of fact. (*Lapp-Gifford Co.* v. *Muscoy Water Co.* (1913) 166 Cal. 25, 27 [134 P. 989]; *Dietl* v. *Heisler* (1961) 188 Cal.App.2d 358, 363 [10 Cal.Rptr. 587]; *Dunlap* v. *Bellah* (1960) 184 Cal.App.2d 579, 585 [7 Cal. Rptr. 766]; *Moore* v. *Satir* (1949) 92 Cal.App.2d 809, 812 [207 P.2d 835]; *D. E. Sanford Co.* v. *Cory Glass etc. Co.* (1948) 85 Cal.App.2d 724, 730 [194 P.2d 127]; *Owens* v.

*Noble* (1946) 77 Cal.App.2d 209, 215 [175 P.2d 241]; *Carpenter* v. *Pacific States S. & L. Co.* (1937) 19 Cal.App.2d 263, 268 [64 P.2d 1102, 66 P.2d 656]; *Everhardy* v. *Union Finance Co.* (1931) 115 Cal.App. 460, 466 [1 P.2d 1024].)

Unless there is a lack of evidence to support the finding of the trier of fact, its determination of this issue will not be disturbed on appeal. (*Everhardy* v. *Union Finance Co., supra*; *Kinkle* v. *Fruit Growers Supply Co.* (1944) 63 Cal. App.2d 102, 112 [146 P.2d 8]; *Moore* v. *Satir, supra*; *Dunlap* v. *Bellah, supra.*)

In the instant case, the evidence pertinent to the events and transactions allegedly constituting the accord and satisfaction was in conflict. In the first place, as we have seen, Standard's witnesses maintained that it agreed to pay the invoice of July 26, 1962, only on condition it receive ''reassurance'' that it was the final payment on the building and exhibits and that such reassurance was given by Conderback in its letter of August 2, 1962 (see fn. 12, *ante*). On the other hand, Conderback's witness Railsback testified that he attended all of the meetings out of which the accord is supposed to have arisen and that there was no condition affixed to the payment of the invoice. Conderback also introduced testimony explaining how the letter of August 2 happened to be sent (see fn. 12, *ante*). According to Conderback's witnesses, Standard's Whitmore dictated the crucial opening sentence of the letter to Conderback's office manager giving no explanation that this understanding had been reached between the parties and thereafter van der Woert signed the letter on the assumption that it referred to the finality of the particular billing.[22] Standard's check did not indicate it was tendered in full and final payment.

A second and more significant consideration however is the fundamental issue raised by the parties as to the exact nature of their contractual arrangements. As we have set forth above, Standard's evidence was directed to establishing its central thesis that the work was being done on the basis of Conderback's firm bid of February 12, 1962, plus the costs of

[22]Conderback's invoice of July 26, 1962, set forth a column of 16 items, with amounts of billing for only six items, the columnar spaces opposite the others being left blank. The six items billed totalled $39,848.87. Attached to the invoice are detailed schedules covering the same 16 items with a series of columns headed ''Amount as of 7/16/62,'' ''Additional Requested,'' ''Total,'' ''Amount Paid,'' ''Amount Requested,'' ''Amount to be Billed.'' The invoiced amount of $39,838.87 appears as a footing in the columns ''Additional Requested'' and ''Amount Requested.''

any changes or additions thereafter occurring to be negotiated between the parties. Conderback's evidence, on the other hand, was directed to supporting its position that in accordance with the customary business methods employed by the parties over a long period of time, Standard had given Conderback for the Fair Exhibit what amounted to an "open-ended" purchase order to which Conderback's customary formula was to be applied in calculating the amount due. (See fns. 3, 17, *ante*.) Thus the divergent theories of case advanced by the evidence of the respective parties pervade and affect the subsidiary issue of accord and satisfaction. Conderback's evidence on the main issue of the case, to the effect that the firm bid of February 12, 1962, had been superseded by the many additions and changes and that Conderback was to be compensated under an open-ended purchase order by application of a pricing formula, establishes that all expenses were to be computed and billed from time to time and necessarily supports the inference that a billing for an "additional requested" amount was not a final billing for the project as a whole.

Events transpiring after the alleged accord and satisfaction of July and August 1962 fall into the same pattern of plaintiff's evidence. As to these, there was evidence that in September 1962 Standard made a further payment to Conderback; that in the same month the latter sent Standard a list of developments relating to unpaid accounts; that in December 1962 the parties had discussions in connection with additional bills, quite apart from the tax liability; and that Standard made a payment in February 1963.

From all of the foregoing evidence introduced by Conderback, the jury could reasonably conclude that the parties did not agree that the July 26 invoice was to be a final billing and that its payment by Standard was to constitute full payment for the building and exhibits, but could conclude that the various items of expense were to be billed from time to time until Conderback, in accordance with the parties' customary practices in the past, had been paid for all costs of the project.

The *Potter* and *Creighton* cases relied upon by defendant do not declare rules of law different from those set forth by us herein. They are distinguishable on their own facts from the case before us and hold that upon evidence which is neither in conflict nor reasonably susceptible of conflicting inferences the respective creditors therein knew or of neces-

sity must have known that payment was in full satisfaction of all amounts claimed to be due.

We turn to consider defendant's three claims of error in the admission of evidence.

1. At the first trial on the separate defenses Railsback testified on direct examination concerning discussions had with Mattes in the spring of 1963 about Conderback's most recent billing and the formula applicable to it. Railsback was then asked if Mattes approached him with a new formula of his own to which defendant's counsel interposed that "possibly we are getting into objectionable area" and "whether or not Standard offered to help these people out to a certain extent in April would be a matter which would be excluded from evidence" and "I don't think that they should get into any offers made by Standard." Plaintiff's counsel stated that "this isn't a settlement negotiation" and "We are not asking for offers." The court observed that in considering whether or not there was a settlement in July or August 1962, the jury could consider what transpired thereafter and overruled the objection. The witness thereupon testified as set forth in the footnote.[23] At the second trial the same evidence was admitted over defendant's objection that it was "an offer of settlement." Plaintiff's counsel stated "This isn't an offer of settlement. This is introduction now of a different formula after years of dealing." Standard now claims it was prejudiced before both juries.

The rule is well established that offers in compromise are not admissible in evidence as such. (*People* ex rel. *Dept. of Public Works* v. *Forster* (1962) 58 Cal.2d 257, 263 [23 Cal. Rptr. 582, 373 P.2d 630] and cases cited therein; Code Civ. Proc., § 2078; 4 Wigmore on Evidence (3d ed.) § 1061, p. 28; Witkin, Cal. Evidence (1958) p. 182; McCormick on Evidence, pp. 157-158, 539.)

As we think the trial judge properly held at the first trial, evidence of discussions between the parties in 1963 was relevant on the issue then before the jury (see fn. 1, *ante*) of whether there had been an accord and satisfaction between them in July or August 1962. (See *Owens* v. *Noble, supra*, 77

---

[23]Railsback testified: "In the meeting the day before they had offered us—this group of nine people, as I recall, had offered us a 17.625 markup on the over-all cost of the job. This amounted to, well, none on the over-all costs on some balance of it. It amounted to $7,000, which we refused. Mr. Mattes called the ensuing morning, called me personally and offered a different formula that amounted to $28,000, which I also refused."

Cal.App.2d 209, 215.) Plaintiff's counsel there stated that his purpose in introducing such evidence was not to elicit evidence of offers in compromise. At no time did defendant's counsel request an instruction to the jury limiting the purpose for which the evidence might be considered. (See *Hatfield* v. *Levy Brothers* (1941) 18 Cal.2d 798, 810 [117 P.2d 841]; *Daggett* v. *Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 665-666 [313 P.2d 557].) In any event, the first trial was limited to the issues raised by the special defenses. In our view, the admission of the evidence at the first trial was not error.

The problem at the second trial is a more difficult one since, as we have said, plaintiff's theory of case was that it was to be compensated according to a pricing formula and in line with customary practices in the past. In our view, this theory did not justify the admission of what were apparently offers to compromise the then pending dispute and the admission of such evidence was error.

However, even assuming that the admission of the evidence at the first trial was error, neither such error nor the error at the second trial appears to us to be prejudicial in the light of the entire record. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

2. At the first trial evidence was admitted, over defendant's objection, to the effect that prior to 1960 plaintiff had lost money on several jobs it had done for Standard and that in some cases Standard paid plaintiff more money on being apprised of the loss. This evidence of a course of dealing in the past was offered to show the contractual arrangements in the instant matter and to negate the existence of a firm bid contract. Evidence of other similar contracts between the same parties establishing a custom, habit or continuing course of business dealing is admissible as showing that on a particular occasion the thing was done as usual. (*Roberts Distributing Co.* v. *Kaye-Halbert Corp.* (1954) 126 Cal.App.2d 664, 676 [272 P.2d 886]; 2 Wigmore, *op. cit.*, § 377, p. 307; McCormick, *op. cit.*, p. 347; 31A C.J.S., Evidence, § 180, pp. 457-458.) We cannot agree with Standard that this rule became inapplicable in the instant case because the Seattle project was much larger than previous jobs. The record indicates that in respect to the Seattle job Standard conducted its initial discussions and solicited estimates in line with projected budgeting in substantially the same manner as it had on previous occasions.

Defendant also argues, without citation of any cases, that even though the above evidence is deemed proper as showing a prior course of dealing, it was nevertheless inadmissible since it contradicted the express provisions of the "final" billings. Considering the billings as instruments of a contractual nature, nevertheless the evidence did not contradict but rather interpreted them by showing the true intent of the parties and giving the instruments a meaning to which they were reasonably susceptible. It was admissible for such purpose. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal. 2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Hulse* v. *Juillard Fancy Foods Co.* (1964) 61 Cal.2d 571, 573 [39 Cal. Rptr. 529, 394 P.2d 65]; *Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265]; *Imbach* v. *Schultz* (1962) 58 Cal.2d 858, 860 [27 Cal.Rptr. 160, 377 P.2d 272]; Code Civ. Proc., § 1860; Rest., Contracts, § 235(d).)

3. At the first trial defendant's counsel read into evidence portions of the testimony of Railsback given at a deposition taken by defendant in which the witness was asked to explain alleged discrepancies in costs in various documents already before the jury. Railsback testified that he could not explain in detail without records but could explain "in generalities." In the course of this explanation he stated in the deposition that because of Conderback's need for funds, "we would take and let go, things we were negotiating at that moment . . . to get some money that would keep us going until next time. Having had past experience, long years of past experience with Standard I felt sure this would be adjusted fairly and squarely in the ultimate negotiations that followed jobs of this nature."

The deposition testimony then continued: "Q. [By defendant's counsel] And you say you prepared this thing and let go of certain sums, is that right? A. Yes, that is right."

Upon the request of plaintiff's counsel and the order of the court, defendant's counsel was then required, over his objection, to read the rest of the last answer as set forth in the footnote.[24]

Defendant contends that the admission of the rest of the

---

[24]Mr. Brown, defendant's counsel, then read the following complete answer: "Yes, that is right. Putting them off, may I say, putting off certain sums or certain portions of certain sums, hoping that and trusting that they would do as we had previously been on jobs of this nature. I said that this fell into four general areas."

answer was error since the witness' "secret intent" was conclusionary, not responsive and irrelevant. However, the objectionable portion of the answer had some bearing upon the testimony already read and plaintiff's counsel, upon re-direct examination or at any other appropriate time during plaintiff's case, would have been entitled to read such portion into evidence himself. (Code Civ. Proc., § 1854;[25] *Rosenberg* v. *Wittenborn* (1960) 178 Cal.App.2d 846, 852 [3 Cal.Rptr. 459] and authorities there collected; Witkin, *op. cit.,* pp. 677-678; McCormick, *op. cit.,* p. 132; cf. *Zibbell* v. *Southern Pac. Co.* (1911) 160 Cal. 237, 250 [116 P. 513]; *Bacon* v. *Grosse* (1913) 165 Cal. 481, 490 [132 P. 1027].)

It was also within the sound discretion of the trial judge to require defendant's counsel to read all of the answer in order to obviate immediately any false or distorted impression the jury might receive from a fragmentary introduction. McCormick states the applicable rule in this situation as follows: "[T]he prevailing practice seems to permit the proponent to prove any relevant part that he desires. It seems, however, that to guard against the danger where it exists of an ineradicable false first impression, the adversary should be permitted to invoke the court's discretion to require the proponent to prove so much as relates to the fact sought to be proved, that is, all that is relevant to explain or is needed in interpreting the part proved." (McCormick, *op. cit.,* pp. 131-132.) The trial court did not abuse its discretion in the instant case. Furthermore, we cannot see how defendant could have possibly been prejudiced anyway since its counsel, just prior to the answer in dispute, had read into evidence similar testimony (quoted by us above) as to what Railsback "felt" would be done by Standard.

Standard further complains that the court's instructions to the first jury on accord and satisfaction compounded the claimed error since, while stating that accord and satisfaction depended on the mutual intention of the parties, it failed to state that such intention must be determined by the words and actions of the parties and that subjective motives must be disregarded. The point is without

---

[25]Code Civ. Proc., § 1854, provides: "When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing, which is necessary to make it understood, may also be given in evidence."

merit. An examination of the instructions referred to[26] satisfies us that they are correct statements of the law and that, contrary to defendant's claim, they *do* state that the intention of the parties "must be determined from all the circumstances, both *oral* and *written*" (italics added). We do not see how the jury could have been misled into believing that they were to consider also the secret intentions of Railsback.

Standard next contends that there is no evidence to support the verdict of $154,374.45 or any part thereof. The gist of the argument in support of this point seems to be this: that the so-called "firm" bid of February 26, 1962, constituted the contract between the parties and the jury by its verdict in effect disregarded the firm bid and re-evaluated the job on a time and materials basis. Standard seems content to confine its argument to these assertions and within this narrow range. Its responsibility in urging a total insufficiency of evidence extends much further. "The appellate court starts with the presumption that the evidence sustains each finding of fact [citations], and the burden rests upon appellant 'to demonstrate that there is no substantial evidence to support the challenged findings.' [Citations.] To this end appellant must set forth in his brief all material evidence upon the point, not merely his own proofs [citations]; . . ." (*Davis* v. *Lucas* (1960) 180 Cal.App.2d 407, 409 [4 Cal.Rptr. 479].)

We have already alluded to the central issue raised by the parties as to the contractual arrangements entered into between them. This was spelled out in detail by the second pretrial conference order. It is apparent that at the second trial the jury found in favor of plaintiff's theory of case and rejected defendant's theory of case. It follows therefore that in urging the insufficiency of the evidence defendant must do more than merely reassert its position at the trial.

We have carefully examined the record and the

---

[26]The instructions in question are: "You are instructed that question of the existence of an accord and satisfaction depends upon the intention of the parties, which must be determined from all the surrounding circumstances, both oral and written. There must be a meeting of the minds between the parties to an accord, whether there was an accord in this case, is a question for you as jurors to decide."

"For there to be a valid accord and satisfaction you must find that both parties knew and intended that a final settlement was taking place and that each knew and understood the terms of the settlement."

exhibits and we are satisfied that with the exceptions herein-after noted there is substantial evidence as set forth by us above to support a finding that the so-called firm bid did not constitute the contract between the parties but that their agreement must be found in a series of negotiations and arrangements interpreted in the light of their prior course of dealing. Supportive of the conclusion that the letter of February 26, 1962, did not constitute the contract between the parties is the following, among other, evidence in the record: that it arose out of an earlier letter of February 12, 1962, giving an estimate of the total cost of the job which Standard required only for budgetary reasons; that by this time Conderback had already been doing work on the job for seven months on the basis of a previous budget figure in accordance with the parties' prior course of dealing, as we have set forth *supra*; that the initial budget figure had already been exceeded; that the bid of February 26, 1962, was ''based on designs and details as planned as of February 12, 1962''; that nevertheless after it was sent it was quickly ignored in respect to any changes in the project; that it was not ''accepted'' by Standard until March 23, approximately one month before the Fair opened, by which time most of the project had been completed and more than the $351,000 amount of the bid had either been paid by Standard to Conderback or already committed on the job; and finally that, as Whitmore testified, Standard was not about to stop Conderback's performance of the project if the February 26 letter had not been sent.

In its fifth contention on appeal Standard asserts that the inclusion in the judgment of amounts for maintenance[27] and a markup on the design fee is contrary to the undisputed evidence.

As to the first item, the record shows without contradiction that, as defendant claims, the maintenance of the project was under a *separate* contract and that Conderback had been paid in full for all such services. Standard points out to us that notwithstanding this clear testimony, an amount for maintenance of $40,412.91 as calculated according to the formula advanced by plaintiff was erroneously submitted to the jury. After deduction of the sum of

---

[27]Maintenance was a ''24-hour round-the-clock service'' at the Fair building by three of Conderback's employees throughout the course of the Fair. They would keep the building up, clean it, ''work on things, be called at any time to repair, etcetera.''

$31,769.60 admittedly paid in full for maintenance under the separate agreement, this would leave, according to Standard, an excessive amount of $8,641.31. Plaintiff has not questioned these figures either in its briefs or at oral argument but attempts to justify the amount on the basis that Standard did not permit Conderback to dismantle the project. The gist of this argument is that originally Conderback billed its maintenance at cost because it was going to do the dismantling work and, when it was not permitted to do so, it then recomputed the maintenance work using its formula. This point has no merit. Conderback's representative testified that Conderback had been paid for all maintenance services under a separate agreement. It cannot use an alleged breach to create additional maintenance charges in this matter. The inclusion of the sum of $8,641.31 was improper.

 As to the design fee, Standard contends that the parties did not intend that Conderback should have a markup and that as a consequence an excessive amount of $6,609.37 is included in the judgment. We cannot agree. Although Standard points to initial correspondence in which no mention is made of a markup on the design fee, there was testimony that the markup was to be applied at the end of the job. This was a part of plaintiff's general theory of case, involving the prior course of dealing between the parties which the jury passed upon favorably to plaintiff.

Finally Standard contends that the court erred in awarding interest on the judgment from the date of filing the original complaint.[28]

Civil Code section 3287 provides in relevant part: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, . . . ." Under this section interest cannot be awarded prior to judgment when the amount of damages cannot be ascertained except on conflicting evidence. (*Lineman* v. *Schmid* (1948) 32 Cal.2d 204, 212 [195 P.2d 408, 4 A.L.R.2d 1480]; *Coughlin* v. *Blair* (1953) 41 Cal.2d 587, 604 [262 P.2d 305].) The rationale of such rule is that where a defendant does not know what

---

[28]The judgment on the verdict provides for "interest thereon at the rate of seven percent (7%) per annum from the date the obligation became due, being the date of the filing of the Complaint in this action, being May 13, 1963, . . ."

amount he owes and cannot ascertain it except by accord or judicial process, he cannot be in default for not paying it. (*Cox* v. *McLaughlin* (1888) 76 Cal. 60, 70 [18 P. 100, 9 Am.St.Rep. 164]; *Chase* v. *National Indemnity Co.* (1954) 129 Cal.App.2d 853, 865 [278 P.2d 68].) However, when the exact sum of the indebtedness is known or can be ascertained readily the reason suggested for the denial of the interest does not exist. (*Courteney* v. *Standard Box Co.* (1911) 16 Cal.App. 600, 615 [117 P. 778].) If the amount owing can be calculated and determined from statements rendered by the plaintiff to the defendant and those statements are found to be true and correct, it is a matter of mere calculation and prejudgment interest can be awarded. (*Anselmo* v. *Sebastiani* (1933) 219 Cal. 292, 301 [26 P.2d 1].) " 'A dispute as to the price agreed, or as to the amount of work done or its cost, will not prevent the allowance of interest. . . . Where the data necessary to determine the amount due are supplied to the debtor by an invoice or statement, he will be charged with interest for failure to pay.' " (*Anselmo* v. *Sebastiani, supra,* 219 Cal. 292, 301-302; *Ansco Const. Co.* v. *Ocean View Estates, Inc.* (1959) 169 Cal.App.2d 235, 239 [337 P.2d 146] and cases there collected.)

In the instant matter, at least according to plaintiff's theory of case which the jury accepted, there is no single contractual document in which the sum due or the means of calculating it are clearly provided for. Indeed, according to plaintiff's theory, compensation is predicated on an "open ended" purchase order involving application of a pricing formula and negotiations between the parties, all in accordance with a prior course of dealing. We detect an inherent complexity in the process. The applicable test then is whether the exact sum found to be due plaintiff was known to defendant in that it was certain or capable of being made certain by calculation. (See *Gray* v. *Bekins* (1921) 186 Cal. 389, 399 [199 P. 767]; *Perry* v. *Magneson* (1929) 207 Cal. 617, 623 [279 P. 650].) Standard could not determine what was owing until it had received from plaintiff some statement with supporting data from which it could make the determination. Conderback argues that after it presented its final bill in March 1963 it submitted its invoices, shop records and books to Standard. We are not persuaded that defendant was able to ascertain the exact amount due from this data, since plaintiff, who was presumably familiar with both its own data and its own pricing formula, arrived at several different

results.[29] Indeed, as previously mentioned, Conderback's principals, apparently concluding that their previous efforts at billing had not achieved certitude, as late as the latter part of January 1963 undertook a complete reauditing of the entire project. In the course of the reaudit, a Conderback accountant made a miscalculation resulting in a figure $16,652.35 in excess of the amount subsequently admitted by Conderback as the true amount. It is noteworthy that in its original complaint Conderback prayed for general damages in the sum of $139,256.92; in its amended complaint in the sum of $171,026.80; in its bill of particulars in the same amount; and that finally at the trial in June 1964, it amended its prayer to the sum of $154,374.45, for which a verdict was returned. We do not believe that under all the circumstances it can be said that the exact sum due Conderback could have been readily ascertained by Standard. We conclude that the allowance of interest prior to judgment was improper.

The judgment is modified by deducting therefrom the sum of $8,641.31 and by eliminating therefrom interest on the judgment from the date of the commencement of the action to the date of entry of judgment on the verdict and as thus modified the judgment is affirmed. Plaintiff is to recover its costs on appeal.

Molinari, J., and Sims, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 22, 1966.

---

[29]When asked at the trial to explain these divergent results, Railsback testified: "We were at the time, I believe, auditing or in the course of auditing the job as a whole, and *these figures would change, I would dare say if they were audited today, they would change again.*" (Italics added.)